COMMONWEALTH *vs.* MICHAEL P. SCANLON.

Norfolk.   December 7, 1976. — July 5, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Homicide. Accessory. Practice, Criminal,* Charge to jury, Directed verdict. *Witness,* Immunity.

At a murder trial, there was no error in the judge's instructions on accomplice responsibility. [17-19]

Testimony of an immunized witness at a murder trial was sufficiently corroborated by other evidence to warrant a finding that the defendant was guilty of murder in the second degree. [19-20]

INDICTMENT found and returned in the Superior Court on January 13, 1975.

The case was tried before *Brogna, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*William P. Homans, Jr.,* for the defendant.
*Charles J. Hely,* Assistant District Attorney, for the
Commonwealth.

QUIRICO, J.     This is an appeal under G. L. c. 278, §§ 33A-
33G, from the defendant's conviction by a jury of murder
in the second degree and his sentence to imprisonment for
life. He was tried with John R. Murray, who had been in-
dicted as an accessory after the fact to the murder, and
who was acquitted. The primary inculpatory evidence
came from Paul F. Trainor, who had been granted immu-
nity from prosecution under G. L. c. 233, §§ 20D-20G, for
his complicity in the crime. This appeal raises issues re-
garding the responsibility of an accomplice in a joint en-
terprise to commit murder, and the sufficiency of evidence
required under G. L. c. 233, § 20I, to corroborate the testi-
mony of an immunized witness. We affirm the conviction.

1. *Summary of Facts.*

At this point we summarize the extensive evidence pre-
sented at trial. The defendant lived in and managed the
William P. Trainor Corp. apartment complex at 500 North
Quincy Street in Abington. On the evening of December
4, 1974, the day before the killing, Wayne Nisby, Gary
Hart and his wife Carla Hart, and the victim Jay Murphy
drove to the complex. Gary Hart rang the buzzer of John
Murray's apartment. When no one answered, he broke a
window with a hammer. The Harts fled when discovered
and were chased briefly by Scanlon, Murray, and a friend,
but without success.

Scanlon complained of the broken window to a police
officer who had been called, and he identified Murphy,
Nisby, and Gary Hart as the persons who had run away.
The officer told Scanlon to "handle it your own way, . . .
figuring he would get restitution."

Paul Trainor testified that he went to Scanlon's apart-
ment the next morning. Murray joined them and asked
Scanlon to "take care of" the attempted break-in. Accord-
ing to Trainor, Scanlon agreed. During the conversation

the group smoked marihuana and Scanlon took three or four barbiturates. Murray and Scanlon admitted being together but denied meeting with Trainor.

Later in the day, Scanlon, Trainor, and a third employee of William P. Trainor Corp., Peter Lasordo, drove to Boston on business where they engaged in much drinking, and also had dinner with William P. Trainor, the owner of the corporation and uncle of Paul Trainor. Paul Trainor told William Trainor about the break-in at Murray's apartment. After dinner the four returned to an office of the corporation in Abington, arriving about 8:30 P.M. The attempted break-in was again discussed. As William Trainor and Lasordo were leaving, Paul Trainor told Scanlon that "[w]e are going to have to work over somebody," and suggested Murphy and Hart.

While Paul Trainor was in the bathroom, Scanlon made a telephone call and then said he had just called Jay Murphy to set him up to come to the apartment house. Scanlon told Murphy he would give him a thousand "downs" to sell. The two men returned to the apartment house.

Sheila Chaponis and Carla Hart testified that they were with Jay Murphy at the Shipbuilders bar in North Abington on the evening that Murphy received a telephone call at the bar, and that Murphy asked them for a ride to the Trainor apartments. Carla Hart testified that he said he was "getting fronted a thousand downs." The women left the bar around 8:30 P.M. and drove Murphy to the apartments. Murphy asked the women to wait a few minutes for him. They waited fifteen or twenty minutes, and when he did not return they left.

Joseph Calcagno, Scanlon's roommate, testified that Scanlon and Trainor arrived at the apartment about 8:45 P.M. Five or ten minutes after they arrived Calcagno answered the buzzer and told Scanlon that "Jay was on the phone." Scanlon and Trainor then left the apartment.

(a) *Trainor's testimony regarding the shooting.*

As the two men returned to Scanlon's apartment about 8:50 P.M., Scanlon asked Trainor to get his gun. On the

way to get his gun from his car, Trainor met Murray and a police officer investigating a burglary at Murray's apartment. Trainor got the gun, a .38 caliber revolver, and returned to Scanlon's apartment.

Scanlon meanwhile had changed into work clothes and had armed himself with a gun in a shoulder holster and a "hunting jackknife" with a five-inch blade. Scanlon gave Trainor some ammunition for Trainor's weapon. When Murphy rang the buzzer to Scanlon's apartment they went down the stairs and grabbed him. They asked him why he had broken into Murray's apartment, and Murphy responded that he hadn't. Scanlon told Murphy "he was going to off him." Scanlon then stabbed Murphy in the side with the hunting knife, saying, "How's that, you effer."

They forced Murphy into the front seat of Trainor's car, Trainor got in the right rear, and Scanlon drove.

On the way to Rockland, Trainor asked Murphy questions, and Scanlon repeated that "we were going to off him."

They drove to the Harts' house, but left when a police cruiser drove by. They then drove to Avon, beating Murphy as they went. They pulled onto a dirt road and stopped the car. Scanlon told Murphy to get out of the car, and said that "it was all over for him." Scanlon then asked Trainor for his .38 caliber revolver. Scanlon took the gun, pulled Murphy from the car, and threw him to the ground.

Trainor testified that he leaned forward to release the front seat and heard four shots. He could not see Scanlon, but saw a shadow on the ground. He did not see Scanlon within four or five feet of that silhouette but then saw Scanlon standing beside the body. Scanlon returned to the car and said, "They never thought I would do it." He shook Trainor's hand and said, "How's that, brother." As they drove off, Trainor threw Murphy's jacket out of the car window and also threw two bullets into a manhole on their return to the apartment complex. When they arrived there Trainor noticed blood on the car, which he later cleaned with a rag. They entered Murray's apartment

where Scanlon told Murray that "he just blew Jay Murphy's effen head off over in Avon," and if Murray ever said anything "he would blow his effen head off, too." Scanlon and Trainor drank a bottle of whiskey, and then fell asleep in Murray's apartment.

(b) *Scanlon's testimony.*

Scanlon's version was substantially the same as Trainor's until the actual shooting was recounted. He admitted that he called Murphy but said that he did so at Trainor's suggestion. He admitted that he held the knife that stabbed Murphy — the medical testimony was that the wound penetrated a little over four inches — but he said that he merely intended to scare Murphy, and that it was Trainor's slamming Murphy against a wall which caused the deep penetration.

Scanlon testified that he "poked" and "scratched" Murphy with the knife as they drove, but added that Trainor was beating Murphy with the pistol across the face and forehead at the time. Scanlon testified that when he stopped the car he told Murphy to get out and find his way home. Trainor was holding a gun to Murphy's head with his left hand, and holding Murphy's right shoulder with his right hand. Scanlon said he saw Trainor get out of the car but could not see the gun nor see Trainor nor Murphy from the chest up. He heard two shots, his mind "sort of went blank," and he heard a thump — Murphy falling to the ground. Trainor got back into the car and said, "That mother-...junkie will never bother nobody again." Scanlon's testimony was that Trainor spoke to Murray back at the apartment, but he agreed he did not deny responsibility for the death. He said there had been no conversation about killing Murphy and that it was his intention "to scare him, nothing serious, and just to teach him a lesson."

(c) *Further testimony.*

The body was discovered that night about 10 P.M., soon after the death. The body was warm and steam was rising from the blood. The forensic experts testified that there were four gunshot wounds, three located in the area of the

left ear canal which appeared to result from a gun held in direct or very close contact with the skin. A fourth wound, in the right forehead, was inflicted from a greater distance. There were numerous cuts to the body, including a two-inch stab wound in the right breast, and a four-inch wound in the left chest extending into the abdomen. The bullets were .38 caliber bullets fired from the same gun.

When officers went to Murray's apartment the next morning, December 6, to investigate the break-ins, Scanlon was found sleeping on the couch. Scanlon and Murray went to the police station. At some point in the afternoon, a detective-lieutenant asked Scanlon about his activities the night before, and he claimed he had been eating and drinking with the Trainors until about 11 P.M. The lieutenant noticed a substance on Scanlon's left boot, and Scanlon voluntarily agreed to an examination of the boot. A chemist performed benzidine reagent tests on the boot, and on portions of Scanlon's hands and clothing, and obtained positive reactions for blood.

There was testimony that at some later time Scanlon threatened Carla and Gary Hart. He acknowledged that he told Gary Hart to "[s]top going around trying to finger people. Otherwise, you will be pushing up daisies."

Scanlon admitted deep complicity in the matter. His testimony agrees with that of Paul Trainor in virtually every particular except which one of them pulled the trigger of the gun. Trainor received immunity from prosecution in return for his testimony. If the jury believed Trainor's testimony, they could believe that Scanlon pulled the trigger on the gun. If they believed Scanlon's testimony, they could believe that Trainor pulled the trigger. The testimony of the forensic experts tended in some respects to contradict Trainor's testimony about the circumstances of the killing. A spot of blood about four and one-half feet from the base of a tree might be considered inconsistent with Trainor's testimony that Murphy was on the ground when he was shot, and might suggest that Murphy was standing. The analysis of the close contact of the gun to the flesh, which was observed from the bullet wounds, could be considered inconsistent with Trainor's

description of a standing Scanlon shooting the recumbent Murphy. These alleged inconsistencies are the heart of the defendant's present argument.

2. *Instructions on Joint Enterprise.*

The defendant contends that the trial judge erred in his instructions regarding the responsibility of an accomplice. The jury had been presented with conflicting evidence on whether Trainor or Scanlon had shot Murphy. The judge told the jury that, if they believed that Trainor pulled the trigger, they could nevertheless find Scanlon guilty of murder if they found that (1) he "participated in the acts which led to the murder," and (2) "either intended that Murphy be killed or knew that there was a substantial likelihood or chance that Murphy would be killed."

The defendant contends that this instruction — particularly concerning "substantial likelihood or chance" — was inconsistent with a requirement that an accomplice share to some extent the mental state of the principal, *Commonwealth* v. *Richards,* 363 Mass. 299, 307-308 (1973), and permitted the jury to convict Scanlon solely on his knowledge of Trainor's propensity for violence.

In *Commonwealth* v. *Richards, supra,* we stated that accomplice liability would be premised on two requirements where the defendants were charged with assault with intent to murder. First, the accomplice must intentionally assist the principal in the commission of the crime. *Id.* at 307. Second, the accomplice must share with the principal "the mental state required for that crime." *Id.* at 307-308. The necessary mental state was explained and qualified as follows: "But it would suffice if the purpose to murder in the mind of the accessory was *a conditional or contingent one,* a willingness to see the shooting take place . . ." (emphasis added). In *Commonwealth* v. *Ferguson,* 365 Mass. 1, 8 (1974), conditional or contingent intent for the crime of assault and battery by means of a dangerous weapon was defined as knowledge of, and acquiescence in, the principal's carrying the weapon used as a means to the desired end. See *Commonwealth* v. *Blow,* 370 Mass. 401, 407-408 (1976).

The charge adequately explained these requirements.

Where the crime charged is murder, the requisite mental state is malice aforethought. As was stated in *Commonwealth* v. *Mangum,* 357 Mass. 76, 85 (1970), the word "malice" "includes any intent to inflict injury ... without legal excuse or palliation. If there was an intention on the part of the defendant to inflict injury on the deceased which was not justified on any lawful ground or palliated by the existence of any mitigating circumstances, that intention was malicious within the meaning of the law. *Commonwealth* v. *Webster,* 5 Cush. 295, 304 [1850]. *Commonwealth* v. *Bedrosian,* 247 Mass. 573, 576 [1924]. *Commonwealth* v. *Boyajian,* 344 Mass. 44, 48 [1962]. '... [I]t is possible to commit murder without any actual intent to kill or to do grievous bodily harm, and, ... reduced to its lowest terms, malice in murder means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act, coupled perhaps with an implied negation of any excuse or justification.' *Commonwealth* v. *Chance,* 174 Mass. 245, 252 [1899]." The judge charged precisely in these terms.

We think it plain that the judge simply tailored the instructions on the accomplice's required mental state in a trial for assault with intent to murder, which was involved in *Commonwealth* v. *Richards, supra,* to the different intent required in a trial for murder. He stressed that mere knowledge that another intends to commit a crime is insufficient.[1] Moreover, the language of his charge may well be viewed as permitting the jury to infer, as they have the undoubted right to do, an accomplice's mental state from the course of conduct engaged in with the principal. This is not a case of an individual accidentally or unknowingly involved in a criminal enterprise of unanticipated scope.

---

[1] The instruction was as follows: "[I]t is not enough if Scanlon merely thought a crime might or may be committed, that the victim might get killed. Even if that happened and he subsequently helped to conceal the killing, it is not enough. He has to know that there is more than a possibility or more than a 'maybe.' He has to know that there is a substantial chance that the victim will be killed."

Scanlon by his own admission lured the victim to his apartment, armed himself with a hunting knife and loaded gun, gave ammunition to Trainor for another gun, stabbed the victim, and abducted him to an isolated spot on a dirt road where he was killed. In the circumstances of this case, the jury might well have been convinced that the defendant knew of the "substantial likelihood" that death would follow from actions of Trainor, and that he was a willing participant in the acts which led to that death. See *Commonwealth* v. *Ambers,* 370 Mass. 835, 838-839 (1976); *Commonwealth* v. *Blow,* 370 Mass. 401, 407 (1976); *Commonwealth* v. *Hogg,* 365 Mass. 290, 295-296 (1974); *Commonwealth* v. *Ferguson,* 365 Mass. 1, 9 (1974).

In reviewing a judge's instructions, "[w]e are concerned with the impression left with the jury by the charge as a whole." *Commonwealth* v. *Ramey,* 368 Mass. 109, 113-114 (1975), and cases cited. From that perspective, we are persuaded that there was no error in the instructions on accomplice responsibility.

3. *Directed Verdict.*

The defendant argues that the judge erred in denying his motion for a directed verdict because the testimony of the immunized witness Paul Trainor was not sufficiently corroborated under G. L. c. 233, § 20I. We consider the evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Sandler,* 368 Mass. 729, 740 (1975), at the conclusion of the Commonwealth's case in chief, *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 (1976); *Commonwealth* v. *Baker,* 368 Mass. 58, 80-81 (1975). See *Commonwealth* v. *Chase,* 372 Mass. 736, 752 (1977).

General Laws c. 233, § 20I, inserted by St. 1970, c. 408, provides: "No defendant in any criminal proceeding shall be convicted solely on the testimony of, or the evidence produced by, a person granted immunity under the provisions of section twenty E." In *Commonwealth* v. *DeBrosky,* 363 Mass. 718, 730 (1973), this court stated that the statute "require[s] that there be some evidence in support of the testimony of an immunized witness on at least one element of proof essential to convict the defendant."

See *Commonwealth* v. *Turner*, 371 Mass. 803, 811-813 (1977); *Commonwealth* v. *Donahue*, 369 Mass. 943, 949, cert. denied, 429 U.S. 833 (1976).

The defendant concedes that the testimony of the immunized witness was corroborated under this standard as to one element of proof essential to convict the defendant — that Murphy died as the result of gunshot wounds to the head. Because of seeming contradictions between Trainor's testimony and that of the forensic experts about the circumstances of the killing, it is argued that there was insufficient confirmatory evidence to connect the defendant with the crime.

We have considered the defendant's suggestion that we modify the rule of corroboration laid down in the *DeBrosky* and successor cases, but we decline to do so. Furthermore, we agree with the Commonwealth's argument that a wealth of corroborating testimony linked Scanlon to the crime, despite the fact that only Trainor and Scanlon could say how the killing actually occurred. For example, Carla Hart and Sheila Chaponis testified that the victim received a telephone call and that they drove him to the Trainor apartments. In addition, Carla Hart testified that the victim said that in the course of the telphone call he had been offered drugs on credit. Calcagno testified that Scanlon and Trainor left Scanlon's apartment immediately after the victim rang the buzzer and asked for Scanlon. Any seeming conflict between Trainor's testimony and that of the pathologist and the police chemist was for the jury to resolve, so long as a prima facie case had been made out. See *Commonwealth* v. *Fiore*, 364 Mass. 819, 824 (1974); *Commonwealth* v. *Holiday*, 349 Mass. 126, 129 (1965).

4. *Review Under G. L. c. 278, § 33E.*

We have considered the whole case on the law and the evidence, and we conclude that the verdict was neither against the law nor the evidence. The interests of justice require neither a new trial nor the entry of a verdict of a lesser degree of guilt than was found by the jury.

*Judgment affirmed.*