NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11220


COMMONWEALTH  vs.  ROBERT B. VACHER.



Barnstable.    April 11, 2014.  -  August 19, 2014.

Present:  Ireland, C.J., Spina, Gants, Duffly, & Lenk, JJ. [1]


Homicide.  Constitutional Law, Admissions and confessions, Search and seizure, Voluntariness of statement, Probable cause.  Search and Seizure, Standing to object, Probable cause.  Evidence, Identification, Opinion, Photograph, Immunized witness.  Identification.  Practice, Criminal, Admissions and confessions, Agreement between prosecutor and witness, Capital case, Instructions to jury, Motion to suppress, Standing, Voluntariness of statement.  Joint Enterprise.  Witness, Immunity.



Indictments found and returned in the Superior Court Department on April 10, 2009.

A pretrial motion to suppress evidence was heard by Gary A. Nickerson, J., and the cases was tried before Robert C. Rufo, J.


James L. Sultan (Kerry Haberlin with him) for the defendant.
Julia K. Holler, Assistant District Attorney, for the Commonwealth.

---

[1] Chief Justice Ireland participated in the deliberation on this case prior to his retirement.

LENK, J.  A Superior Court jury found the defendant guilty of murder in the first degree, on theories of deliberate premeditation, extreme atrocity or cruelty, and felony murder.[2] On appeal, the defendant asks us to recognize for the first time the concept of "target standing," and to declare the witness immunity statute, G. L. c. 233, § 20C, unconstitutional.  He argues that, in litigating his own motions to suppress, he should have been afforded target standing to challenge the violation of his alleged coventurers' constitutional rights.  He further argues that the witness immunity statute, G. L. c. 233, § 20C, is facially unconstitutional, in that it operates to benefit only the Commonwealth and unfairly skews the adversary system, and unconstitutional as applied to him, in that the Commonwealth's reliance on a "spate" of immunized witnesses deprived him of a fair trial.

The defendant also contends that the trial judge's failure to exclude identification testimony, and his failure to instruct the jury pursuant to Commonwealth v. DiGiambattista, 442 Mass. 423, 447-448 (2004), concerning the partial recording of the defendant's interrogation by police, were erroneous and require a new trial.  Concluding that there was no prejudicial error, we

---

[2] The defendant also was convicted of armed robbery, the predicate felony underlying the felony-murder conviction; two counts of assault and battery by means of a dangerous weapon; and disinterring a body.

3

affirm the defendant's convictions.  After a review of the

entire record pursuant to G. L. c. 278, § 33E, we discern no

reason to exercise our power to reduce the defendant's

conviction to a lesser degree of guilt or to order a new trial.

1.  Introduction.  On December 16, 2008, the victim's body

was found burning in a pit on Jennifer Lane in Hyannis.  The

victim, sixteen year old Jordan Mendes, had been stabbed in the

neck and face twenty-seven times, and had suffered a gunshot

wound to the chest.[3]  He was last seen alive shortly after

2 P.M., the end of the school day, on December 15, 2008.[4]  Forty-

five witnesses testified at the defendant's trial, five of them

pursuant to a grant of immunity.  The prosecutor elicited

testimony that the victim, his half-brother Charlie M.[5] (then

aged thirteen), and the defendant (then aged twenty), were

involved in the sale of drugs, particularly the prescription

painkiller Percocet.  The Commonwealth's theory at trial was

---

[3] The cause of death was determined to be a gunshot wound to
the torso with perforations of the liver and colon, and incise
and stab wounds to the head and neck, including trachea and
major blood vessels.

[4] There was no testimony concerning the time of death.

[5] A pseudonym.  We refer to all of the middle school, high
school, and college witnesses and alleged participants by
pseudonyms.

Charlie is the defendant's first cousin; Charlie's mother
and the defendant's mother are sisters.  The defendant is not
related to the victim.

that the defendant, as part of a joint venture with Charlie and John R., also thirteen at that time, killed the victim in a scheme to steal drugs and cash from him. The defense theory was that Charlie, the picked-on younger brother of the victim, was the true culprit, who retaliated against the victim's bullying by killing him, without the defendant's involvement.

Before the defendant was questioned in connection with the victim's death, police interviewed both Charlie and John on December 18, 2008. Charlie and John made statements inculpating the defendant, and based on those statements, police issued a "be on the lookout" alert for the defendant. Police stopped the defendant in his vehicle later that night and brought him to Barnstable police headquarters, where he was interrogated.

Information learned in the course of John's interview also was set forth in the affidavit supporting the application for a warrant to search the defendant's vehicle, which was allowed. In proceedings against Charlie and John, however, a Juvenile Court judge suppressed the entirety of Charlie's December 18, 2008, statement to police, and most of John's, due to the officers' failure to follow proper procedures for interrogating juveniles under the age of fourteen. Before trial, the defendant unsuccessfully sought to have suppressed the evidence seized pursuant to the search of his vehicle. He argued, inter alia, that information in the search warrant affidavit that had

been obtained from John in contravention of John's constitutional rights should have been redacted, and that what would have remained following such redaction was insufficient to establish probable cause. A Superior Court judge disagreed, ruling that there was no need to suppress evidence against the defendant obtained as a result of a violation of a third party's constitutional rights, and that, in any event, even if the affidavit were redacted as the defendant wanted, there would still have been probable cause for the search.

2. Facts. Based on the evidence at trial, the jury could have found the following. The victim, a sophomore at Barnstable High School, lived with his grandmother in an apartment in Hyannis. He had his own bedroom, which he always locked when he was not at home; even his grandmother could not access his bedroom without the key. He also had installed locks on his closet doors. On his belt loop, he carried a key chain that included a key to his grandmother's apartment, a key to a safe, and a key bearing the Boston Red Sox insignia. The victim's room was very neat, and he swept the floor in a particular manner so that he would be able to see footprints if someone had been in his room.

The victim spent a great deal of time with his half-brother Charlie and was often at Charlie's mother's house on Arrowhead Drive in Hyannis (Arrowhead Drive house). The two were both

involved in selling drugs, particularly Percocet.  The victim often carried large amounts of cash, and at least once was seen with up to $10,000 on his person, which he organized into stacks of $1,000, folding each stack in half and wrapping it with a rubber band.

a.  Monday, December 15, 2008.  After school ended at 2 P.M. on December 15, 2008, a classmate dropped the victim off on Arrowhead Drive.  Charlie, John, and the defendant also had been dropped off at the Arrowhead Drive house around the same time by Diana R.,[6] one of the defendant's classmates at Cape Cod Community College.  Charlie telephoned Louis L.,[7] a student at Barnstable High School, expressing interest in purchasing a black Nissan Maxima that Louis was selling for $11,000.  Louis and his girl friend picked up Charlie and the defendant in the Nissan and drove to the high school parking lot.  At the school, Charlie gave Louis $11,000 in cash, which was organized into piles of $1,000, with each stack folded in half and wrapped in a rubber band; a photograph of Charlie holding the cash, taken by Louis, was admitted in evidence at trial.  The defendant showed Louis his driver's license, and Louis agreed to let the defendant test drive the vehicle with Charlie.

---

[6] Diana R. testified pursuant to a grant of immunity.

[7] Louis L. testified pursuant to a grant of immunity.

At some point after 4 P.M., Charlie's grandmother, who was also the victim's grandmother, saw Charlie enter her locked apartment through the front door, using the victim's keys.[8] Charlie had never before used the victim's keys to enter the apartment. She asked Charlie if he would buy her some ginger ale, because she was not feeling well. After a stop at a convenience store, Charlie returned with the ginger ale to his grandmother's apartment, in a black vehicle, between 7 and 9 P.M.[9] Charlie's grandmother asked him if he had a cigarette, and he gave her a filtered menthol cigarette.

Later that evening, Charlie dropped by the house of the victim's godmother in Hyannis. The victim kept some of his belongings in the closet of the upstairs bathroom there, including a safe box containing money. Although another bathroom was available, Charlie waited for someone else to finish showering in order to use the upstairs bathroom in particular. After making use of that bathroom, he left.

At approximately 8:00 P.M., the defendant, Charlie, and John met Louis at a pharmacy in Hyannis to return the Nissan,

---

[8] The victim's grandmother recognized the keys as belonging to the victim based on the Boston Red Sox logo on one of them.

[9] Still photographs taken from video surveillance footage of the convenience store, showing the defendant inside the store, carrying what appears to be a soda bottle, were introduced at trial. As discussed infra, the defendant argues that a detective's testimony identifying him as the person in the photographs was improper.

which the defendant had been driving, and Louis gave them back the $11,000 in cash. As they were walking away, Louis called after them that they had left their keys on a key chain in the ignition; he testified that he recognized the keys as belonging to the victim.

At some time during the evening, the defendant telephoned Diana and told her that he would give her ten Percocet pills if she came to the Arrowhead Drive house right away, where he, Charlie, and John were. When Diana arrived at the house, she saw that the three of them had a "big bag" containing, in her estimation, approximately one thousand Percocet pills; she testified that she never before had seen them with such a large supply. The four of them then spent time at another house on Elm Street before returning to the Arrowhead Drive house for the night. Diana initially did not want to spend the night at the Arrowhead Drive house, preferring instead to spend time with the victim, with whom she was "hooking up," but the three males repeatedly assured her that the victim would be coming to the house. While she waited for the victim to arrive, Diana consumed Percocet and Oxycontin with the others, and eventually agreed to spend the night.[10] Diana telephoned the victim

---

[10] Diana testified that, at some point in the past, she had seen a gun in Charlie's bedroom in the basement of the Arrowhead Drive house. She also had been with Charlie when he purchased a black knife that he called "the Hawk." She had seen the knife

throughout the night, but was unable to reach him.  The victim never showed up at the Arrowhead Drive house.

b.  Tuesday, December 16, 2008.  In the morning, Charlie asked Diana to drive him to his grandmother's apartment, because he was worried that the victim had not come to the Arrowhead Drive house the night before.  Diana drove Charlie, John, and the defendant to the apartment.  Once there, Charlie went into the victim's bedroom and then left the apartment.

Charlie then said that he "wanted to get a car," so Diana drove them to a dealership in Hyannis.[11]  Charlie and the defendant spoke with a salesman about purchasing a silver 2000 BMW and negotiated a sale price for the vehicle, which had a sticker price of $10,995.[12]  Charlie presented $7,500 in cash and the defendant supplied the difference, grouped in $1,000 increments and wrapped in rubber bands.  The vehicle was registered in the defendant's name.

Meanwhile, the victim's grandmother was growing increasingly worried about her grandson, whom she had not seen since the previous day.  She and the victim's mother drove to

_____

on a washing machine in the basement sometime during the day on December 15, 2008.

[11] Diana testified that she did not know how old Charlie was at the time, and that he had told her that he was seventeen.

[12] The salesman noticed that Charlie looked "very young" but did not specifically inquire into his age.

the houses of different friends and family members, looking for the victim, to no avail.  Charlie returned to his grandmother's apartment with John between 5 and 6 P.M. that evening, wearing a new jacket.  His grandmother took the victim's keys from Charlie and went into the victim's bedroom.  She noticed that there was duct tape on a door in the room; she testified that the victim was "immaculate about his room" and would not have put tape on his door.

The victim's grandmother then received a telephone call from her son, the father of both Charlie and the victim, who told her to take the victim's sister with her to check the places where the children used to play.  Charlie and John then left the apartment.  Sometime early that evening, Charlie was seen behind the wheel of a BMW at a local gasoline station, as the defendant walked towards it, carrying a red gasoline can.  The defendant got into the BMW and John came out of it, holding the can as he walked toward the gasoline pumps.

Approximately twenty-five minutes after leaving her apartment, the victim's grandmother and sister arrived at a place in the woods where the children often spent time.  They noticed a bright orange light in the distance, and realized that it was a fire emanating from a pit.  The victim's body was burning at the bottom of the pit.  Emergency personnel arrived at the scene, extinguished the fire, and extracted the victim's

body, which had been wrapped in a sheet and a comforter.[13] Evidence later recovered from the scene included a package of Newport menthol cigarettes,[14] a red pushpin, and a pink Starburst candy;[15] a certified accelerant detection dog also twice alerted to the presence of gasoline.

After she received news of the victim's death, Diana telephoned the defendant and asked him if he knew what had happened and whether he knew who was responsible.  The defendant responded, "We think we have an idea," and told her that he and Charlie were going to New York.[16]

c.  Thursday, December 18, 2008.  On December 18, 2008, the defendant drove in the BMW to the home of his friend Sam T.[17] The defendant was carrying bags of Oxycontin and Percocet pills, and showed Sam a "wad" of cash that appeared to be at least

---

[13] The victim's grandmother testified that she recognized the comforter as one that Charlie used when he lived with her in 2007.

[14] As mentioned, testimony at trial indicated Charlie had been seen with menthol cigarettes.

[15] Colored pushpins and a package of Starburst candy were later found in the basement of the Arrowhead Drive house.

[16] The defendant did not go to New York after the discovery of the victim's body, but spent the night of December 17 at a motel in Attleboro.

[17] Sam T. testified pursuant to a grant of immunity.

$1,000.[18]  Along with two other friends, they went to the mall, where the defendant spent cash on purchases for a friend and himself.

Later that evening, after dropping off the other friends, Sam and the defendant drove to Wellfleet to meet their friend Ella M.  During the trip, the defendant said, "I have something to tell you.  I killed Jordan Mendes.  I shot him, and I stabbed him.  I bodied him."  He said that he and Charlie had planned to rob the victim for his money,[19] but then "shit went bad" and he shot the victim while they were in the basement of the Arrowhead Drive house after school one day, and also stabbed him in the neck.  The defendant told Sam that he and Charlie had rolled the body in a blanket, thrown it in a ditch, and burned it with gasoline.  The defendant went on to say that he was not worried about getting caught because he had "cleaned it up" with bleach.

In Wellfleet, the two picked up Ella[20] and drove to a restaurant.  Sam went inside the restaurant while the defendant and Ella consumed a crushed Percocet pill in the vehicle, using

---

[18] Sam testified that he never had seen the defendant, whom he had known since childhood, with that amount of cash before.

[19] Another witness, one of the defendant's classmates, testified that, one week before the victim's death, the defendant told her that "within a week, he was going to be getting a BMW for ten stacks."

[20] Ella M. testified pursuant to a grant of immunity.

a $100 bill that the defendant supplied to inhale it.[21] The defendant told Ella that he "had all the money in the world" and wanted to spoil her and take her out to dinner whenever she desired. After they were seated inside the restaurant, the defendant told Ella that he loved her but that he was "going away for a long time" and that she would not be able to see him. He then took a "wad of money" out of his pocket and scattered it on the table. Ella counted somewhere between $500 and $1,000, but the defendant said that he had over $28,000.

After dinner, Ella and the defendant continued to talk in the BMW. When Ella asked him how he came to have so much money, the defendant told her, "We jumped someone," and that he had robbed that person of his pills and money.[22] The defendant, "very nervous [and] shaking," said that "it was a mess" and "mentioned something about blood." He said that he was going to

---

[21] Ella also testified that she had met the defendant earlier that day at the Registry of Motor Vehicles in Yarmouth to buy drugs from him. The defendant was with Charlie and carried a bag of at least fifty Percocet and Oxycontin pills. The defendant showed Ella his new BMW, telling her that he had purchased it with cash.

[22] In addition to confessing to Sam and Ella, the defendant confessed to an inmate in the Barnstable house of correction shortly after he was arrested. According to the inmate, who was housed in the cell adjacent to the defendant, the defendant said that he and "Little Jordan" had shot and stabbed the victim and burned the body in a ditch. The inmate also testified that the defendant said that he and Charlie had taken apart and disposed of the gun that was used to shoot the victim.

be in a lot of trouble and reiterated that he would be going away for a long time.

Sam and the defendant dropped off Ella and returned to Sam's house, where the defendant left pills, approximately $2,000 in cash, and a knife.  On the way back from Sam's house, the defendant was stopped by police, who had received a "be on the lookout" alert regarding a BMW registered to the defendant. An officer of the Barnstable police department read the defendant the Miranda rights after the defendant got out of the vehicle, but did not place him under arrest.  Another officer asked the defendant if he would go voluntarily to the police station to speak with detectives about a recent homicide, and the defendant agreed.  The BMW was towed to the police station.

A redacted[23] recording of the defendant's interview with police was played for the jury.[24]  During the interview, the defendant did not admit to killing the victim, but made statements concerning his whereabouts over the prior days that were inconsistent with other evidence.  For example, he claimed

---

[23] The interview was redacted primarily to remove any reference to statements made by Charlie and John implicating the defendant.

[24] The audio portion of the first four minutes of the interview was not recorded.  One of the interviewing officers testified that, although the video recording was motion-activated, turning on the audio recording required manual intervention.  The officers initiated the audio recording after a preliminary exchange concerning the logistics of the interview.

that, after Diana dropped him off at the Arrowhead Drive house on the afternoon of December 15, 2008, he stayed there for the rest of the day, and maintained that he spent the entirety of December 16, 2008 at his own home in South Yarmouth.

d.  Police investigation.  i.  Search of Arrowhead Drive house.  Police searched the Arrowhead Drive house pursuant to a warrant, finding, among other things, a number of stains in the basement that tested positive for the presence of blood.[25]  A forensic expert testified that deoxyribonucleic acid (DNA) consistent with the victim's DNA profile was found in several of the blood stains, including stains on the wall, on an end table, on a remote control, and on the floor.[26]  She testified that the probability of the DNA profile of a randomly selected Caucasian individual matching that found in the blood stains was at least 1 in 19.18 quintillion.[27]  Additionally, a DNA mixture from at least two individuals was found on a sneaker, to which the

---

[25] The basement, to which Charlie had a key, was partitioned into makeshift rooms using sheets that had been affixed to the ceiling beams with multicolored pushpins.  In one of the ceiling beams, investigators noted holes several feet apart but no sheet.  A package of Starburst candies also was found in the basement, and a red gasoline tank was recovered from a shed in the backyard.

[26] The defendant presented one witness, a different deoxyribonucleic acid (DNA) expert, who testified that she would have excluded the defendant as a potential contributor to the DNA found on the knife blade.

[27] The defendant is Caucasian.

victim and the defendant were included as potential contributors and Charlie and John were excluded.

ii. <u>Search of Nissan</u>.  In Louis's Nissan, between the passenger seat and the center console, police found a black folding knife that tested positive for the presence of blood and contained a DNA mixture of at least two individuals.  The major profile of DNA extracted from the knife blade was consistent with that of the victim, and the defendant could not be excluded as a potential contributor.  The probability of DNA in the mixture matching the DNA profile of a randomly selected Caucasian individual was 1 in 28.  A tennis racquet that tested positive for the presence of blood and bore DNA consistent with the victim's was found in the Nissan's trunk.

iii. <u>Search of BMW</u>.  Pursuant to a search warrant, police found a number of new articles of clothing, with store tags still on them, in the trunk of the defendant's BMW, as well as some clothing that appeared to have been worn.  One T-shirt and one pair of sneakers that appeared to have been worn tested positive for the presence of blood; DNA found on the T-shirt matched the defendant's profile, and neither the victim nor John could be excluded as contributors to DNA found on the sneaker.

3. <u>Discussion</u>.  The defendant raises constitutional issues concerning the availability of "target standing" under art. 14 of the Massachusetts Declaration of Rights and the

constitutionality of the witness immunity statute, G. L. c. 233, §§ 20C-20E. The defendant also argues that there was error in the admission of testimony from a police officer who identified him as the person shown in surveillance footage, and in the judge's failure to instruct the jury pursuant to Commonwealth v. DiGiambattista, 442 Mass. 423 (2004).

a. Target standing. Probable cause to stop and search the defendant's BMW rested in part on statements made by John and Charlie implicating the defendant. A Juvenile Court judge ordered the majority of those statements suppressed in the juvenile proceedings against John and Charlie, primarily due to the failure of police to adhere to the protocol established by Commonwealth v. A Juvenile, 389 Mass. 128, 134 (1983), for interrogating juveniles under the age of fourteen. The defendant argues that, as the real target of the police investigation, he should have been granted standing to assert the violation of John and Charlie's constitutional rights in litigating his own motions to suppress, and the failure to afford him such standing resulted in the erroneous denial of his motions. He asks this court to recognize the concept of target standing, which we have not done previously.

Although the United States Supreme Court has rejected the theory under the Fourth Amendment, see Rakas v. Illinois, 439 U.S. 128, 133-138 (1978), "[w]e have left open the question

whether target standing has vitality under art. 14 of the Massachusetts Declaration of Rights."  Commonwealth v. Scardamaglia, 410 Mass. 375, 379 (1991), citing Commonwealth v. Manning, 406 Mass. 425, 429 (1990).  We have expressed a "reluctance to grant a wide scope to target standing, and perhaps thereby to deny the trier of fact highly relevant evidence of guilt," id. at 380, but have recognized certain circumstances in which allowing such standing may have a salutary deterrent effect on police misconduct.

For example, "[u]nconstitutional [police conduct directed at] small fish intentionally undertaken in order to catch big ones may have to be discouraged by allowing the big fish, when caught, to rely on the violation of the rights of the small fish, as to whose prosecution the police are relatively indifferent."  Commonwealth v. Manning, supra at 429, citing 4 W.R. LaFave, Search and Seizure § 11.3(h), at 354-355 (2d ed. 1987).  See 6 W.R. LaFave, Search and Seizure § 11.3(h), at 301 (5th ed. 2012) (posing hypothetical situation in which target standing might lie where X is arrested for armed robbery, and subsequently, "acting with the specific intention of finding additional evidence incriminating X with respect to that crime, the police conduct a fruitful search of X's wife").  Nonetheless, "the need to create a deterrent effect on police misconduct by the recognition of target standing is not great

except perhaps in the case of distinctly egregious police conduct."  Commonwealth v. Scardamaglia, supra at 380.

We need not resolve in this case the extent of the availability of target standing under art. 14, because the defendant's claim that he was, in fact, the target of the police investigation is belied by the record.  Rather than pointing to the defendant as the "big fish" that police sought, the record indicates that, before conducting the interviews, police had information suggesting that Charlie and John, in addition to the defendant, could have played significant roles in the victim's death, and actively were pursuing both juveniles as suspects. Police officers testified at the hearing on the defendant's motions to suppress that they knew prior to the interviews that Charlie had used the victim's keys to access the victim's bedroom on December 15, 2008, and that the victim never gave his keys to anyone; that the victim's grandmother believed that the victim had in his possession a large amount of cash, which Charlie was trying to find; that Charlie was known to own a gun; that John, who had been with Charlie earlier in the day on December 16, 2008, had been seen running from the rear of the Arrowhead Drive house as police approached; that the defendant recently had purchased a BMW; and that Charlie, John, and someone matching the defendant's description had been seen near a silver BMW with a gasoline container.

Thus, unlike a wife who is searched by police with the specific intent of finding evidence incriminating her husband, Charlie and John were not ostensibly innocent "small fish, as to whose prosecution the police [were] relatively indifferent." Commonwealth v. Manning, supra at 429. Rather, insofar as information already known to police suggested the juveniles' material involvement in the victim's death, it appears that police "were genuinely interested in implicating [them], and thus the added threat of exclusion vis-à-vis [the defendant] would not seem necessary in such circumstances." 6 W.R. LaFave, Search and Seizure § 11.3(h), at 305 (5th ed. 2012).

Indeed, it is not the case that Charlie and John were without opportunity to contest the police misconduct directed at them, a circumstance which otherwise might counsel in favor of allowing a third party to assert their rights instead. To the contrary, in separate criminal proceedings, Charlie and John both successfully challenged the violations of their respective constitutional rights, resulting in the suppression of all statements obtained as a result of those violations. To be sure, because both Charlie and John were juveniles under the age of fourteen, only the defendant could be prosecuted as an adult, subject to the prospect of a life sentence without the possibility of parole. See G. L. c. 119, §§ 52, 58, 72B. See also G. L. c. 265, § 2. But that alone cannot suffice to

establish the defendant as the actual target of the investigation, particularly where, as here, there was ample evidence of the juveniles' involvement.  Thus, even assuming the availability of target standing under art. 14, the defendant cannot establish that he was the prime target of the police investigation and therefore was properly denied target standing to challenge the violations of the juveniles' constitutional rights.[28],[29]

b.  Constitutionality of immunity statute, G. L. c. 233, §§ 20C-20E.  The defendant also challenges the constitutional validity of the witness immunity statute, G. L. c. 233, §§ 20C-20E, both facially and as applied to him.  The defendant argues

---

[28] Since the defendant's argument fails because he was not in fact the prime target of the police investigation, we do not consider whether the police misconduct directed at John and Charlie was "distinctly egregious."  Commonwealth v. Scardamaglia, 410 Mass. 375, 380 (1991).

[29] We note also that the Superior Court motion judge found that there was probable cause to stop the defendant's BMW, seize it, and interrogate the defendant even without considering the information gleaned from illegally obtained statements, a finding that is supported by the record.  In particular, before police issued the "be on the lookout" alert for the defendant or stopped his vehicle, they had information that the defendant had been at the Arrowhead Drive house around the time that the victim was last seen alive; that Charlie and the defendant had purchased a BMW with cash on the day that the victim's body was discovered, which was particularly significant given that the killing appeared to be motivated by robbery of a large amount of cash; and that Charlie, John, and a person matching the defendant's description were seen with a gasoline container shortly before the victim's body was found burning in a pit amidst an odor of gasoline.

that the scheme for immunizing witnesses in the Commonwealth, whereby an order granting immunity to a trial witness may be issued only "at the request of the attorney general or a district attorney," G. L. c. 233, § 20E (a), is unconstitutional insofar as it "clearly inures to the benefit of only one party in our adversary system of justice." That the power to seek immunity for witnesses lies only with the government, the defendant contends, bestows on the prosecution "an undue tactical advantage," rendering a defendant's trial "fundamentally unfair and its result unreliable." The defendant argues that the Commonwealth's reliance on a "spate" of immunized witnesses in his case deprived him of his Federal and State constitutional rights by undermining "the procedural safeguards which ostensibly protect the defendant from conviction based upon false evidence."

Turning first to the defendant's as-applied challenge, the Commonwealth in this case elicited testimony from five immunized witnesses: Diana, Louis, Sam, Sam's mother, and Ella.[30] Based on their testimony, viewed in the aggregate, the jury could have found that the defendant had been at the Arrowhead Drive house around the time that the victim was last seen alive on December

---

[30] The Commonwealth also intended to offer immunity to a sixth witness, and obtained an order granting immunity to a seventh witness. Both nonetheless refused to testify and were found to be in contempt.

15, 2008; that he test-drove Louis's Nissan on December 15, 2008, in which the victim's keys were seen at the time and a knife later was found; that he had at least $2,000 in cash and large bags of pills on his person on December 18, 2008, some of which he sold; and that he confessed to shooting and stabbing the victim and robbing him of pills and money.

Defense counsel lodged his first objection to the Commonwealth's asserted overreliance on immunized witnesses before the fifth such witness took the stand, arguing that this excessive resort to offers of immunity constituted a "structural flaw." The judge took no action, noting that the objection had been raised "at the eleventh hour."[31]

Our jurisprudence has not vested criminal defendants with expansive rights vis-à-vis the immunization of witnesses. To the contrary, "[w]e have held, without qualification, that a defendant 'has no standing to argue that the testimony of . . . purportedly immunized witnesses [is] the product of improper grants of immunity,'" reasoning that "[t]he privilege against self-incrimination is a personal right of the witness, and one that the witness is in a position to protect by his own means." Smith v. Commonwealth, 386 Mass. 345, 349 (1982), citing

---

[31] In a motion for a required finding of not guilty at the close of the Commonwealth's case, defense counsel also raised the issue of the Commonwealth's excessive reliance on immunized witnesses.

Commonwealth v. Simpson, 370 Mass. 119, 121 (1976).  While a prospective defense witness's assertion of his right under the Fifth Amendment to the United States Constitution could affect a defendant's ability to present his defense most effectively, the compulsory process provisions of the Federal and State Constitutions do not mandate a judicial grant of immunity to such a witness as a matter of course.  See Commonwealth v. Curtis, 388 Mass. 637, 646 (1983), S.C., 417 Mass. 619 (1994).  Although we have left open the possibility that "unique circumstances" could require a judge to grant a limited form of immunity to a defense witness, see id., we have not been presented yet with such a scenario.  See Pixley v. Commonwealth, 453 Mass. 827, 834 n.7 (2009) (collecting cases).

Other courts have recognized that such unique circumstances might emerge "where there exists prosecutorial misconduct arising from the government's deliberate intent to distort the fact-finding process."  United States v. Angiulo, 897 F.2d 1169, 1190 (1st Cir.), cert. denied sub nom. Granito v. United States, 498 U.S. 845 (1990), and cases cited.  See Commonwealth v. Cash, 64 Mass. App. Ct. 812, 818 (2005), quoting Curtis v. Duval, 124 F.3d 1, 9 (1st Cir. 1997) (judicial grant of immunity not required where there was no evidence of "attempt to harass or intimidate potential witnesses, or . . . that the prosecutor

deliberately withheld immunity for the purpose of hiding exculpatory evidence from the jury").

Here, however, the defendant has pointed to no such prosecutorial misconduct, nor has he even suggested the existence of a witness who was deterred from testifying in his favor due to his inability to secure a grant of immunity. Under these circumstances, "we see no logical basis for departing from the principle . . . that 'it is up to the jury to evaluate the credibility of a[n immunized] witness' . . . based merely upon the number of witnesses that received inducements from the government in exchange for their testimony." United States v. Garcia Abrego, 141 F.3d 142, 152 (5th Cir.), cert. denied, 525 U.S. 878 (1998), quoting United States v. Bermea, 30 F.3d 1539, 1552 (5th Cir. 1994). See Commonwealth v. Burgos, 462 Mass. 53, 74, cert. denied, 133 S. Ct. 796 (2012) (assessing credibility of witnesses who have received consideration in exchange for testimony is within province of jury). Standing alone, the Commonwealth's presentation of immunized witnesses, particularly where a defendant has not sought to immunize his own prospective witness, does not deprive a defendant of his right to a fair trial.[32]

---

[32] We decline the defendant's invitation to exercise our general superintendence power pursuant to G. L. c. 211, § 3, to announce a rule limiting the Commonwealth's authority to immunize witnesses. A prerequisite to the invocation of this

The Commonwealth is, in any event, constrained by G. L. c. 233, § 20I, which provides that a defendant cannot be convicted solely on the basis of immunized testimony. That was not the situation here, as the immunized testimony was amply corroborated by nonimmunized witnesses. See Commonwealth v. Fernandes, 425 Mass. 357, 360 (1997), quoting Commonwealth v. Scanlon, 373 Mass. 11, 19 (1977) ("[T]o provide the requisite credibility, 'there must be some evidence in support of the testimony of an immunized witness on at least one element of proof essential to convict the defendant'"). There was evidence that a blood mixture containing DNA matching the victim's, to which the defendant could not be excluded as a potential contributor, was found on a knife discovered in a vehicle that the defendant had been driving. There was also testimony that, approximately one week before the victim's death and the defendant's purchase of the BMW, the defendant told a classmate that, within a week, he would "be getting a BMW for ten stacks." Although two of the immunized witnesses provided powerful testimony concerning the defendant's confession to them that he had killed the victim, a third, nonimmunized witness also testified to a similar statement by the defendant. Finally, the

---

court's "truly extraordinary" general superintendence power is "a substantial claim of violation of [a litigant's] substantive rights," which has not been demonstrated here. See McMenimen v. Passatempo, 452 Mass. 178, 184 (2008), S.C., 458 Mass. 1007 (2010).

defendant was seen holding a tank of gasoline at a gasoline station shortly before the victim's body was discovered on fire, having been doused with an accelerant.  This evidence "not only corroborate[d] the essential elements needed to convict the defendant but also link[ed him] to the crime."  Id.

Other safeguards further preserved the defendant's right to a fair trial.  The judge instructed the jury, before each immunized witness testified, that they could consider a witness's grant of immunity in assessing his or her credibility, and gave a similar instruction in his final charge.  The judge also instructed the jury in his final charge that they could not convict solely on the basis of immunized testimony.  In addition, defense counsel thoroughly cross-examined four of the five immunized witnesses on the nature of the inducements they received from the government.  Cf. Commonwealth v. Miranda, 458 Mass. 100, 110-111 (2010), cert. denied, 132 S. Ct. 548 (2011) (rejecting due process challenge to witness payments contingent on outcome of case where, inter alia, judge gave "comprehensive instructions concerning witness credibility" and defense counsel cross-examined witnesses on nature of payments).  We discern no basis to doubt that the defendant received a fair trial.

Finally, because we conclude that G. L. c. 233, § 20E, is constitutional as applied to the defendant, his facial challenge must fail.  See Commonwealth v. Abramms, 66 Mass. App. Ct. 576,

587 (2006) (Brown, J., concurring), citing Blixt v. Blixt, 437 Mass. 649, 652 (2002), cert. denied, 537 U.S. 1189 (2003) ("Where a constitutional construction of a challenged statute is possible, a facial challenge must be rejected").

c. Other errors. i. Identification testimony. Eight still photographs extracted from video surveillance footage taken on December 15, 2008, at a convenience store were admitted in evidence at trial. A detective testified, over objection, that the person seen in the photographs was the defendant. The defendant argues that such identification testimony was improper and unduly prejudicial, because the criteria for the admission of lay opinion identification testimony were not met.

The defendant is correct that the admission of this testimony was erroneous. The general rule is that a "witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 326 (2000), quoting United States v. Farnsworth, 729 F.2d 1158, 1160 (8th Cir. 1984). "Put another way, 'such testimony is admissible . . . when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess.'" Id. at 326-327, quoting United States v. Jackman, 48

F.3d 1, 4-5 (1st Cir. 1995).  If the witness lacks such
familiarity, it is the province of the jury to draw their own
conclusions regarding the identity of the person depicted
without the witness's assistance.  See Commonwealth v. Austin,
421 Mass. 357, 366 (1995); Commonwealth v. Nassar, 351 Mass. 37,
41-42 (1966), S.C., 354 Mass. 249 (1968), cert. denied, 393 U.S.
1039 (1969), quoting Commonwealth v. Sturtivant, 117 Mass. 122,
137 (1875).

Here, there is no indication that the detective possessed
any special familiarity with the defendant that the jury lacked,
or that the defendant's appearance had changed since the time
the footage was taken, such that the jury needed assistance in
identifying the individual depicted.  Contrast Commonwealth v.
Vitello, 376 Mass. 426, 460 (1978) (police officer's testimony
could aid jury in identifying person in photograph as defendant
where officer testified that he had known defendant for long
time and had seen him often, and defendant testified that he had
lost twenty-five pounds since date photograph was taken).

Although we are cognizant of the "increase[d] potential for
inappropriate prejudice to the defendant" stemming from
"identification testimony from a police officer who is so
designated," Commonwealth v. Carr, 464 Mass. 855, 879 (2013),
quoting Commonwealth v. Pleas, supra at 327, we cannot say that
the improper testimony here constituted reversible error.  The

testimony, brief and fleeting as it was, did not overwhelm the other compelling, properly-admitted evidence against the defendant. The defendant argues that the testimony "placed [him] near [the victim's] apartment around the time that the Commonwealth alleged he was murdered," but, where there was no indication that the defendant's appearance at trial was different than it was in the photographs, the jury were capable of drawing the same conclusion. Cf. Commonwealth v. Anderson, 19 Mass. App. Ct. 968, 969 (1985) (erroneous identification testimony harmless where "photographs upon which the non-eyewitnesses based their opinions were introduced in evidence, permitting the jury to decide independently whether the defendant was the person on film"). Moreover, the defendant, in his interview with police, admitted to being in the convenience store on the night in question. Thus, the improper testimony was not prejudicial.

ii. Failure to give DiGiambattista instruction. As discussed, see note 24, supra, the audio portion of the first four minutes of the defendant's police interview was not recorded, although there was a complete video recording. The defendant contends that the judge's failure to give an instruction pursuant to Commonwealth v. DiGiambattista, 442 Mass. 423 (2004) (DiGiambattista), was prejudicial, where the prosecutor argued in her closing argument that there was no

coercion during the interview, and where the jury asked to review the digital video disc (DVD) of the interview during deliberations.

We do not agree with the defendant that the issue properly was preserved for appellate review. Generally, if defense counsel requests a specific instruction and the judge rejects it, or gives an instruction inconsistent with the requested one, we consider the objection to have been preserved. See Commonwealth v. Biancardi, 421 Mass. 251, 253-254 (1995). Here, however, although defense counsel requested a DiGiambattista instruction, the judge never rejected the request; rather, he told counsel that he would consider giving such an instruction in his final charge, but ultimately did not do so. Under the circumstances, "it was entirely likely that the omission was inadvertent and that the judge would have rectified the error had it been brought to his attention. [Defense counsel] should have brought the omission to the judge's attention by objecting at the end of the charge." Commonwealth v. White, 452 Mass. 133, 139 (2008). Because he did not, our review is for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 681 (1992).

We held in DiGiambattista, supra at 447-448, that

"when the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation or an

> interrogation conducted at a place of detention (e.g.,
> a police station), and there is not at least an
> audiotape recording of the complete interrogation, the
> defendant is entitled (on request) to a jury
> instruction advising that the State's highest court
> has expressed a preference that such interrogations be
> recorded whenever practicable, and cautioning the jury
> that, because of the absence of any recording of the
> interrogation in the case before them, they should
> weigh evidence of the defendant's alleged statement
> with great caution and care."

Further, "[w]here voluntariness is a live issue and the humane practice instruction is given, [as it was here,] the jury should also be advised that the absence of a recording permits (but does not compel) them to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt." Id. at 448.

The failure to give a DiGiambattista instruction was erroneous. Contrary to the Commonwealth's suggestion, the State police sergeant's testimony[33] concerning the substance of the unrecorded portion of the interview does not cure "the failure to preserve the evidence in the first place." Id. at 447 n.23. Nor is it the case, as the Commonwealth argues, that there was no need for a cautionary instruction because the entire recording was available to the defendant -- the defendant had

---

[33] The State police sergeant testified that, during the unrecorded portion of the interview, he thanked the defendant for agreeing to speak with police, explained that they were conducting an investigation into the circumstances surrounding the death of the victim, and asked whether the defendant would be willing to speak about that; the defendant agreed to do so.

the full video recording, but no party had the full audio recording, which did not exist.  Since the audiotape recording of the defendant's interrogation was incomplete and defense counsel requested the DiGiambattista instruction, the requirements for giving such an instruction were met, and the instruction should have been given.

Nonetheless, there was no substantial likelihood of a miscarriage of justice.  The defendant does not contest the interviewing State police sergeant's testimony as to the introductory nature of the first four minutes of the interview, and nothing in the record suggests that any substantive exchange took place during that time.  To the contrary, the recorded portion began as the sergeant introduced himself and his partner to the defendant and explained that the interview would be recorded, tending to corroborate the sergeant's trial testimony.  See note 33, supra.  The recorded portion, spanning thirty-five pages of transcript, also captured the defendant's waiver of Miranda rights, and the form memorializing the waiver was admitted at trial.  Thus, it appears that most, if not all, of the substance of the interview was recorded and played for the jury, who accordingly were well situated to determine the voluntariness of the defendant's statements.

In any event, even if the jury had disregarded the defendant's recorded statements in their entirety, there was

ample other evidence supporting a conviction of murder in the first degree.  The defendant's statements did not directly incriminate him, while other overwhelming evidence did.  Cf. Commonwealth v. Barbosa, 457 Mass. 773, 801-802 (2010), cert. denied, 131 S. Ct. 2441 (2011) (trial judge's error in giving only part of DiGiambattista instruction did not prejudice defendant where his unrecorded police interview was "some of the weakest evidence against him").

4.  Review pursuant to G. L. c. 278, § 33E.  Pursuant to our duty under G. L. c. 278, § 33E, we consider an error neither objected to by the defendant at trial nor raised in his appeal to this court.

Where, as here, the Commonwealth proceeds against a defendant on a joint venture theory of an offense that includes possession of a weapon as an element, the judge should instruct the jury that they must find that the defendant knew of his coventurers' possession of that weapon.  See Commonwealth v. Lee, 460 Mass. 64, 68-70 (2011), and cases cited.  After the defendant's 2011 trial, we clarified that, where the Commonwealth proceeds on alternate theories of a defendant's guilt (that the defendant was the main perpetrator of the offense or that his coventurer in fact carried out the offense), further explanation is required.  In such a case, the judge should instruct the jury that, to convict the defendant, they

must find either that a coventurer committed the offense and the defendant participated while knowing that the coventurer possessed a weapon, or that the defendant himself committed the offense with a weapon.  See Commonwealth v. Bolling, 462 Mass. 440, 450 (2012).  "[T]he requirement of knowledge of a weapon in the context of murder in the first degree on a joint venture theory applies only where the conviction is for felony-murder and the underlying felony has as one of its elements the use or possession of a weapon."  Commonwealth v. Britt, 465 Mass. 87, 100 (2013).

On all four offenses charged, the Commonwealth here proceeded against the defendant on alternate theories of his guilt.  Three of those offenses included an element of possession of a weapon, namely, felony-murder with armed robbery as the predicate offense,[34] the armed robbery itself, and assault and battery with a dangerous weapon.  As such, the judge should have instructed the jury regarding the requirement of the defendant's knowledge of his alleged coventurers' possession of a dangerous weapon.  However, his failure to do so did not

---

[34] Because the defendant was convicted of murder on three different theories, the defendant's conviction of armed robbery was not duplicative of his conviction of felony-murder.  "Where, as here, the conviction of murder is based on a theory [or theories] in addition to the theory of felony-murder, the conviction of the underlying felony stands."  Commonwealth v. Felder, 455 Mass. 359, 370-371 (2009), quoting Commonwealth v. Brum, 441 Mass. 199, 200 n.1 (2004).

result in a substantial likelihood of a miscarriage of justice. The defendant did not argue at trial that his alleged coventurers carried out the offenses with weapons that he did not know they possessed.  Indeed, such a position would have been weak at best in light of evidence, such as confessions to two different people as well as DNA evidence, that the defendant himself used a weapon to kill the victim.  It is therefore unlikely that the omitted jury instruction would have affected the outcome of the case, and we discern no reason, on this or any other basis, to order a new trial or to reduce the conviction of murder to a lesser degree of guilt.

<u>Judgments affirmed</u>.