SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. RAJIV R., a juvenile

 
 Docket:
 SJC-13634
 
 
 Dates:
 November 4, 2024 – April 15, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Essex
 

 
 Keywords:
 Firearms. Delinquent Child. Practice, Criminal, Juvenile delinquency proceeding, Sentence, Findings by judge, Hearsay. Juvenile Court, Delinquent child. Youthful Offender Act. Parent and Child, Testimony by parent against child. Evidence, Testimonial privilege, Photograph, Opinion, Hearsay. Statute, Construction. Witness, Privilege, Police officer. Constitutional Law, Sentence, Vagueness of statute, Cruel and unusual punishment.
 
 

       Complaint received and sworn to in the
Essex County Division of the Juvenile Court Department on September 21, 2021.
      Indictment found and returned in the Essex
County Division of the Juvenile Court Department on October 25, 2021.
      A pretrial motion to exclude testimony was
heard by José A. Sánchez, J., and the cases were tried before him.
      The Supreme Judicial Court granted an
application for direct appellate review.
      John P. Warren for the juvenile.
      Jennifer D. Cohen, Assistant District
Attorney, for the Commonwealth.
      K. Hayne Barnwell, Claudia Leis Bolgen,
& Leon Smith, for youth advocacy division of the Committee for Public
Counsel Services & others, amici curiae, submitted a brief.
      DEWAR, J. 
A jury found the juvenile delinquent on firearm charges and, after
further proceedings, guilty on a youthful offender indictment for one of the
offenses.  At the trial, the juvenile was
nineteen years old, and the Commonwealth called his mother as a witness against
him to testify regarding events that took place when the juvenile was seventeen
years old.  On appeal, the juvenile
argues that the parent-child witness disqualification statute -- which
prohibits testimony by a parent "against the parent's minor child" in
proceedings "in which the victim . . . is not a family member
and does not reside in the family household," G. L. c. 233,
§ 20, Fourth (§ 20, Fourth) -- precluded admission of his mother's
testimony against him, even though he was no longer a "minor" at the
time of trial.  He also argues that the
trial judge committed several errors in admitting other evidence against him,
and that his sentence was unlawful and unconstitutional on various grounds.
      We conclude, in agreement with the trial
judge's interpretation, that the statutory prohibition of testimony by a parent
"against the parent's minor child" in cases not involving a family
household victim does not apply once the child has reached the age of eighteen.  G. L. c. 233, § 20,
Fourth.  The judge therefore did not err
in admitting the mother's testimony against the juvenile.  With respect to the juvenile's other evidentiary
arguments, we discern no prejudicial error, although we conclude that the judge
should not have admitted a detective's testimony that a firearm depicted in
still images was "identical" to the firearm admitted in evidence, nor
two hearsay statements not required to explain the state of police knowledge
during the investigation.  Regarding the
juvenile's claims of error related to his sentence, we agree only that the
judge erred in not issuing written findings explaining the juvenile's sentence
as required under G. L. c. 119, § 58, and we conclude that this
error did not prejudice the juvenile because of the judge's detailed
explanation of the sentence on the record. 
We affirm.[1]
      1. 
Background.  a.  Commonwealth's case.  The jury could have found the following.  The juvenile lived in a two-family home in
Lawrence with his mother and four siblings. 
When the juvenile was seventeen years old, his mother became concerned
about his possession of a firearm and called a Lawrence police detective to
inform him of that concern.  She also
told the detective where the firearm could be found.  The detective and other police officers
executed a search warrant at the juvenile's home to look for the firearm.  There, the officers found the juvenile and
his brother together in a bedroom.  The
juvenile was reclined on a bed, and his brother was reclined next to him on a
separate sofa bed.  The juvenile and his
brother obeyed the officers' order to exit the room.  The officers then observed a firearm
protruding from underneath a pillow on which the juvenile had been resting his
head.  The firearm was loaded with one
round in its chamber and thirty rounds of ammunition in an extended magazine.
      b. 
Prior proceedings.  The juvenile
was charged in a delinquency complaint with possession of a firearm without a
firearm identification card, G. L. c. 269, § 10 (h); unlawful
possession of a large capacity feeding device, G. L. c. 269,
§ 10 (m); and improper storage of a firearm, G. L. c. 140,
§ 131L.[2]  He was subsequently
indicted as a youthful offender with respect to the large capacity feeding
device charge.
      Before trial, the juvenile filed a motion
seeking to prevent the Commonwealth from calling his mother as a witness,
invoking the parent-child witness disqualification statute.  See G. L. c. 233, § 20, Fourth
("A parent shall not testify against the parent's minor child
. . . in a . . . trial of . . . [a] delinquency
or youthful offender proceeding . . .").  The juvenile was eighteen years old by this
stage in the proceedings, and the Commonwealth opposed the motion on the ground
that, because the juvenile was no longer a minor, the statute did not
apply.  The motion judge, who also was
the trial judge, denied the juvenile's motion. 
The judge reasoned that the disqualification by its terms applied only
to testimony against a "minor" child, and, if the Legislature had intended
that the statute apply more broadly, the Legislature would have included such a
provision.
      At the juvenile's trial, the Commonwealth
called the juvenile's mother as its first witness.  She answered some preliminary questions but
refused to answer after being asked about her communications with the
detective.  The judge previously had
conducted an in camera hearing with the mother, who was represented by counsel,
and determined that her right against self-incrimination under the Fifth
Amendment to the United States Constitution did not apply to the testimony
sought by the Commonwealth.  See
Commonwealth v. Martin, 423 Mass. 496, 504 (1996).  Following a recess during which the mother
spoke with her attorney, she persisted in her refusal to answer the question,
even after the judge ordered her to do so. 
The judge held her in contempt and ordered her remanded to custody.
      The detective's testimony followed the
same day.  Over objections by the
juvenile that we address in our discussion of the issues, the detective
described executing the search warrant at the juvenile's home and locating the
firearm underneath the juvenile's pillow. 
The Commonwealth introduced the firearm itself in evidence.  The detective then was presented with still
images from a music video recording and, over the juvenile's objection,
testified that the images depicted a Lawrence-area rapper known to the
detective, holding a firearm "identical" to the firearm in
evidence.  The detective used the
rapper's stage name but did not identify the rapper as the juvenile.
      The following morning, the mother was
present in court and stated that she would answer the questions put to
her.  She then identified the individual
depicted in the still images as her son, the juvenile; described having called
the police because she was concerned about her son's possession of a firearm;
and, when asked if she had seen her son with a firearm, responded that the
firearm was "always in the room."
      The jury returned verdicts finding the
juvenile delinquent on all charges and, after a separate trial, to be a
youthful offender in connection with the large capacity feeding device
charge.  On the youthful offender
adjudication, the judge sentenced the juvenile to from six to seven years in
State prison, with 590 days of credit for the time he spent in the custody of
the Department of Youth Services (DYS) while awaiting disposition.  In addition to bringing the instant appeal,
the juvenile appealed from his prison sentence to the Appellate Division of the
Superior Court.  The Appellate Division
modified the sentence to from four to eight years, with 590 days again deemed
served.
      2. 
Discussion.  a.  Parent-child witness disqualification.  We begin with the juvenile's claim that the
judge erred by ruling that the parent-child witness disqualification statute
did not apply at his trial because he was then no longer a minor.
      "We review questions of statutory
interpretation de novo." 
Commonwealth v. Morris, 492 Mass. 498, 502-503 (2023), quoting
Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 331 (2021).  "A fundamental tenet of statutory
interpretation is that statutory language should be given effect consistent
with its plain meaning and in light of the aim of the Legislature unless to do
so would achieve an illogical result." 
Commonwealth v. Vigiani, 488 Mass. 34, 36 (2021), quoting Rahim v.
District Attorney for the Suffolk Dist., 486 Mass. 544, 547 (2020).  "Where the language of a statute is
clear and unambiguous, it is conclusive as to legislative intent."  Commonwealth v. Perez Narvaez, 490 Mass. 807,
809 (2022), quoting Cavanagh v. Cavanagh, 490 Mass. 398, 405 (2022).  "However, '[w]here there is doubt or ambiguity
about the meaning of a statutory provision, the court may turn to extrinsic
sources to determine legislative purpose and intent.'"  Perez Narvaez, supra, quoting Cavanagh,
supra.
      The statutory provision at issue here is
included among other testimonial disqualifications and privileges in G. L.
c. 233, § 20.  These "are
exceptions to the general duty imposed on all people to testify" (citation
omitted).  Matter of a Grand Jury
Subpoena, 430 Mass. 590, 594 (2000). 
They contravene "the fundamental principle that 'the public
. . . has a right to every [person's] evidence,'" id., quoting United
States v. Bryan, 339 U.S. 323, 331 (1950), and they "diminish the evidence
before the court," Three Juveniles v. Commonwealth, 390 Mass. 357, 359
(1983), cert. denied sub nom. Keefe v. Massachusetts, 465 U.S. 1068 (1984).  We therefore construe these disqualifications
and privileges narrowly.  Vigiani, 488
Mass. at 38, citing Matter of a Grand Jury Investigation, 443 Mass. 20, 23-24
(2004).
      The language of § 20, Fourth, is
conclusively clear and unambiguous as to the question before us.  The provision consists of three clauses, the
first delineating the scope of the parent-child disqualification, the second
defining the term "parent," and the third addressing the category of
cases involving a family household victim, which otherwise are excluded from
the scope of the disqualification:
"[(1)] A
parent shall not testify against the parent's minor child and a minor child
shall not testify against the child's parent in a proceeding before an inquest,
grand jury, trial of an indictment or complaint or any other criminal,
delinquency or youthful offender proceeding in which the victim in the
proceeding is not a family member and does not reside in the family household;
[(2)] provided, however, that for the purposes of this clause, 'parent' shall
mean the biological or adoptive parent, stepparent, legal guardian or other
person who has the right to act in loco parentis for the child; [(3)] provided
further, that in a case in which the victim is a family member and resides in
the family household, the parent shall not testify as to any communication with
the minor child that was for the purpose of seeking advice regarding the
child's legal rights."
G. L. c. 233,
§ 20, Fourth.  The statute thus
provides that, in cases not involving a family household victim, "[a]
parent shall not testify against the parent's minor child" in certain
proceedings, including "delinquency or youthful offender
proceeding[s]."  Id.  Although § 20, Fourth, does not itself
define "minor," the General Laws elsewhere provide that, in construing
statutes, "'[m]inor' shall mean any person under eighteen years of
age" unless -- as no one contends is true here -- "a contrary
intention clearly appears." 
G. L. c. 4, § 7, Forty-eighth.  Accordingly, under § 20, Fourth, in the
specified proceedings not involving a family household victim, a parent
"shall not testify against" the parent's child under the age of
eighteen.  We therefore agree with the
judge that, under the statute's plain terms, this witness disqualification does
not apply at a proceeding where a parent's child is no longer under the age of
eighteen.  "To conclude otherwise
would improperly extend the statute's application," Matter of a Grand Jury
Investigation, 443 Mass. at 24, by excluding testimony against a child who is
not, as the statute requires, a "parent's minor child," G. L.
c. 233, § 20, Fourth.
      Resisting this conclusion, the juvenile
first argues that the statute is ambiguous regarding the moment with respect to
which the child's status as a minor should be assessed.  He contends that the fact that the
disqualification also applies to other stages of the proceeding, including
"before an inquest[ or] grand jury," suggests that the Legislature
intended the disqualification to apply throughout the entirety of Juvenile
Court proceedings, regardless of whether the juvenile reaches the age of
majority.  Such a construction would
comport, he notes, with the Juvenile Court's continuing jurisdiction over
pending cases under G. L. c. 119, § 72, even after a juvenile
reaches age eighteen.  And he further
contends that the final clause of § 20, Fourth -- stating that, even with
respect to cases involving a family household victim, where the
disqualification generally does not apply, "the parent shall not testify
as to any communication with the minor child that was for the purpose of
seeking advice regarding the child's legal rights" -- shows that the
disqualification is intended to provide lasting protection to the substance of
a minor child's communications.
      We discern no such ambiguity in the
statute.  The fact that the Legislature
specified an array of proceedings in which the disqualification would apply
does not render ambiguous the scope of the disqualification itself, which the
Legislature limited to testimony against a "minor" child.  Indeed, in specifying the proceedings in
which the disqualification would apply, the Legislature could have, but did
not, provide that the disqualification would apply to all testimony by a parent
against a child in Juvenile Court proceedings,[3] or all testimony against the
parent's child in proceedings concerning offenses allegedly committed by the
child as a minor.  Instead, the witness
disqualification hinges on the child's age.
      Nor does the statute's final clause create
an ambiguity.  The Legislature chose not
to extend the parent-child witness disqualification to cases involving family
household victims, evidently concluding that doing so would too greatly
"diminish the evidence before the court" in such cases.  Three Juveniles, 390 Mass. at 359.  Yet, consistent with this court's previous
observation that compelling a parent to testify over a child's objection may in
certain circumstances "raise serious issues regarding the privilege
against self-incrimination or the right to counsel," Matter of a Grand
Jury Subpoena, 430 Mass. at 599 n.15, the Legislature did exclude, in family
household victim cases, testimony "as to any communication with the minor
child that was for the purpose of seeking advice regarding the child's legal
rights," G. L. c. 233, § 20, Fourth.[4]  This choice by the Legislature to protect
certain communications otherwise falling within an exception to witness
disqualification does not create an ambiguity in the disqualification itself.  Rather, it shows that, where the Legislature
intends to protect the substance of communications, "it knows how to do
so."  Doe v. Board of Registration
in Med., 485 Mass. 554, 562 (2020), quoting Stearns v. Metropolitan Life Ins.
Co., 481 Mass. 529, 536 (2019).  See also
Vigiani, 488 Mass. at 41, quoting Simmons v. Clerk-Magistrate of the Boston
Div. of the Hous. Court Dep't, 448 Mass. 57, 65 (2006) ("where the
Legislature has employed specific language in one portion of a statute, but not
in another, the language will not be implied where it is absent").  For cases not involving a family household
victim, instead of enacting a privilege protecting some or all of a minor
child's communications, the Legislature created a witness disqualification, limited
to a parent's testimony "against the parent's minor child."  G. L. c. 233, § 20, Fourth.
      And we do not agree with the juvenile's
further contentions that we should not accept the statute's plain meaning
because doing so would frustrate the Legislature's purpose or produce illogical
results.  He argues that this
interpretation of the statute "disincentivizes parents from intervening
and offering guidance when their minor child misbehaves" and "deters
parents from appropriately guiding their court-involved children through the juvenile
court system"; creates an incentive for the Commonwealth to delay
indictment or trial past a child's eighteenth birthday to secure a parent's
testimony; and leads to an incongruity because a parent may be disqualified
from testifying at an earlier stage of a case before being required to testify
once the child is no longer a minor, a turning point the juvenile characterizes
as "an arbitrary criterion." 
In a similar vein, the dissent observes that a parent's testimony
against a child, or even the possibility of such testimony, may fray familial
bonds at a time when such bonds may be especially important, including for
children who have reached the age of eighteen.
      We acknowledge that the
"well-recognized goal of protecting the parent-child relationship,"
Vigiani, 488 Mass. at 41, would be furthered to a greater extent by the
interpretation urged by the juvenile and the dissent, and that the prospect of
a parent testifying against the parent's own child remains a wrenching one even
after the child reaches the age of eighteen. 
But "the decision whether to create [a] privilege necessarily
depends on balancing vital, yet competing, social policies," including
"the interest in the ascertainment of truth and the just resolution of
cases."  Matter of a Grand Jury Subpoena,
430 Mass. at 597-598.  The Legislature
engaged in such balancing when it last amended the statute in 2018, see St.
2018, c. 69, § 111, broadening it from an earlier form that had
contained no disqualification whatsoever of a parent's testimony against a
minor child and instead had disqualified only "[a]n unemancipated, minor
child, living with a parent" from testifying against the parent,
G. L. c. 233, § 20, as amended through St. 1986, c. 145.  While the dissent observes that nothing in
the extrinsic legislative history of the 2018 amendment demonstrates that the
Legislature considered the specific question before us today, the terms of an
unambiguous statute are conclusive evidence of the Legislature's intent, see
Perez Narvaez, 490 Mass. at 809 -- here, an intent to limit the
disqualification's scope to testimony against a parent's "minor"
child.  And, given the privileges and
obligations in our society that turn on reaching the age of majority,[5] as
well as the need for "line drawing" in defining a testimonial
privilege, see Matter of a Grand Jury Subpoena, supra at 598, the Legislature's
choice to end the disqualification when a child reaches the age of eighteen is
not arbitrary.
      The judge thus did not err in concluding
that, because the juvenile was no longer a "minor child," the
parent-child disqualification in G. L. c. 233, § 20, Fourth, did
not disqualify the juvenile's mother from testifying at his trial.
      b. 
Evidentiary objections.  The
juvenile challenges the admission in evidence of four portions of the testimony
of the detective who spoke with the juvenile's mother and was present at the
search that revealed the firearm.  We
review a judge's evidentiary decisions for abuse of discretion, "'a clear
error of judgment in weighing' the factors relevant to the decision such that
the decision falls outside the range of reasonable alternatives" (citation
omitted).  L.L. v. Commonwealth, 470
Mass. 169, 185 n.27 (2014).  Because the
juvenile objected to the detective's testimony in each challenged respect, we
review any error for prejudice.  See
Commonwealth v. Grier, 490 Mass. 455, 475-476 (2022).  "An error is not prejudicial only if the
Commonwealth can show with fair assurance . . . that the judgment was
not substantially swayed by it." 
Id. at 476, quoting Commonwealth v. Martin, 484 Mass. 634, 647 (2020),
cert. denied, 141 S. Ct. 1519 (2021).
      i. 
Lay opinion testimony.  The
juvenile argues that the judge erred by admitting the detective's
identification of a person appearing in two still images as a rapper known to
the detective and the detective's opinion that a firearm depicted in the images
was "identical" to the firearm found with the juvenile and entered in
evidence.  For the reasons that follow,
we conclude that any error in admitting the identification of the rapper was
not prejudicial, and that, while the judge erred in allowing in evidence the
detective's opinion that the firearms were "identical," that error
also was not prejudicial.
      "A lay opinion . . . is
admissible only where it is '(a) rationally based on the perception of the
witness; (b) helpful to a clear understanding of the witness's testimony or the
determination of a fact in issue; and (c) not based on scientific, technical,
or other specialized knowledge.'" 
Commonwealth v. Canty, 466 Mass. 535, 541 (2013), quoting Mass. G. Evid.
§ 701 (2013).  "Making a
determination of the identity of a person from a photograph or video image is
an expression of an opinion." 
Commonwealth v. Pina, 481 Mass. 413, 429 (2019).  "A lay witness is permitted to identify
an individual depicted in a video recording or photograph if that testimony
would assist the jurors in making their own independent
identification."  Id., citing Mass.
G. Evid. § 701 (2018).  "The
general rule is that a witness's opinion concerning the identity of a person
depicted in a . . . photograph is admissible if there is some
basis for concluding that the witness is more likely to correctly identify the
[person] from the photograph than is the jury."  Pina, supra at 429-430, quoting Commonwealth
v. Vacher, 469 Mass. 425, 441 (2014). 
"Put another way, such testimony is admissible . . . when
the witness possesses sufficient relevant familiarity with the [person] that
the jury cannot also possess" (citation omitted).  Pina, supra at 430.
      We discern no prejudicial error in the
judge's decision to admit the testimony that the individual in the images was a
Lawrence-area rapper known to the detective. 
The detective testified that he was an "avid rap follower" and
was particularly familiar with music produced by youths in Lawrence.  He further testified that he had seen "a
music video from an individual" with a particular stage name, and that he
would recognize a still image from that music video.  Only after establishing this foundation did
the Commonwealth show the detective two still images from a music video and
elicit testimony that the images depicted "a rapper that goes by" the
particular stage name.  The detective's
testimony regarding his familiarity with youth rappers in Lawrence and with the
music video from which the still images were taken both authenticated the
images and informed the jury of the Lawrence-area origin of the images.  See Pina, 481 Mass. at 429-430.  While the juvenile argues that this testimony
nevertheless lacked relevance to the case because the detective was not
permitted himself to identify the juvenile in the images, no prejudice resulted
from any error in admitting the testimony, because the juvenile's mother later
identified the juvenile in the same images.
      We next consider the detective's testimony
regarding the firearm.  After identifying
the individual in the still images as a Lawrence-area rapper with whom he was
familiar, the detective went on to state that "[h]e's holding a firearm
. . . [w]hich is identical to the firearm" admitted in
evidence.  The judge erred in allowing
this testimony over the juvenile's objection. 
Lay witness identifications of an object, like lay witness opinions
generally, are admissible only if the lay witness's testimony will assist the
jury in making their own identification of the object.  See Grier, 490 Mass. at 476; Commonwealth v.
Thomas, 476 Mass. 451, 465-466 (2017) (no abuse of discretion in suppressing
witness's identification of firearm where "her description of the firearm
provided no detail that would suggest that she could identify anything more
than its type").  In summarily
asserting that the firearms were "identical," the detective did not
impart the kind of detailed information based on training and experience with
firearms that could assist a jury in its own comparison between a firearm
depicted in a still image and a firearm admitted in evidence.  This lay opinion testimony therefore should
not have been admitted.  See Commonwealth
v. Wardsworth, 482 Mass. 454, 476 (2019), quoting United States v.
Vázquez-Rivera, 665 F.3d 351, 361 (1st Cir. 2011) (testimony identifying
defendant in video based on evidence available to jury "usurped the jury's
role instead of being helpful to it").
      The error does not warrant reversal in the
circumstances of this case, however.  The
jury were capable of independently comparing the images with the firearm in
evidence, and, accordingly, the prosecutor's closing argument invited the jury
to make their own comparison and did not refer to the detective's improper
assertion that the firearms were identical. 
And the jury were unlikely to be "substantially swayed" by the
detective's assertion in the context of the other evidence in the case
(citation omitted).  Grier, 490 Mass. at
476.  That evidence included testimony
that the firearm was found in a bedroom under a pillow on which the juvenile
was resting his head; that the juvenile's mother had called the police because
she was concerned about the juvenile's possession of a firearm and disclosed
where the firearm could be found; and that, in the juvenile's mother's words,
the firearm was "always in the room." 
We therefore discern no prejudice from the error.[6]
      ii. 
Hearsay to establish state of police knowledge.  The juvenile also challenges two statements
made by the detective when testifying about the search of the juvenile's home,
contending that each should have been excluded for lack of foundation and as
inadmissible hearsay.  First, after
testifying that he had executed a search warrant to look for a firearm and
being asked about the individual targeted by the warrant, the detective
testified, "It was a firearm that was allegedly in [the] possession of
[the juvenile]."  The juvenile
contends that, because the Commonwealth did not establish a foundation for the
statement based in the detective's personal knowledge, it was "backdoor
hearsay" repeating the juvenile's mother's out-of-court statements to the
detective.  Second, the detective
testified that, after the juvenile's mother admitted the officers to the
residence, she "directed [the officers] to [the juvenile's]
bedroom."  The juvenile argues that
this statement, too, was admitted improperly without foundation and conveyed an
implicit statement from the mother that the bedroom was the juvenile's -- an
important piece of evidence, the juvenile contends, because the juvenile lived
in the home with four siblings and the Commonwealth presented no other evidence
that linked the bedroom to the juvenile, such as identification or other
belongings in the bedroom.  We agree with
the juvenile that these two statements by the detective exceeded the bounds of
hearsay admissible to show the state of police knowledge, but we discern no
prejudice to the juvenile from the errors.
      "We have permitted the use of
carefully circumscribed extrajudicial statements in criminal trials to explain
the state of police knowledge." 
Commonwealth v. Sullivan, 478 Mass. 369, 376 (2017), quoting Commonwealth
v. Rosario, 430 Mass. 505, 508 (1999). 
"[A]n arresting or investigating officer should not be put in the
false position of seeming just to have happened upon the scene; he should be
allowed some explanation of his presence and conduct."  Sullivan, supra, quoting Commonwealth v. Cohen,
412 Mass. 375, 393 (1992).  "Hearsay
testimony to explain the reasons for police action, however, carries a high
probability of misuse, because a witness may relate historical aspects of the
case, replete with hearsay statements in the form of complaints and reports,
even when not necessary to show state of police knowledge" (quotations
omitted).  Sullivan, supra, quoting
Rosario, supra at 509.  Such testimony,
therefore, "is admissible only if the testimony is based on the police
officer's own knowledge, and is limited to the facts required to establish the
officer's state of knowledge, and the police action or state of police
knowledge is relevant to an issue in the case."  Sullivan, supra.
      We agree with the juvenile that, with
respect to both challenged statements, the detective's testimony was admitted
improperly, because the hearsay was not "limited to the facts required to
establish the officer's state of knowledge."  Sullivan, 478 Mass. at 376.  While it was proper for the detective to give
some explanation of how he came to be present in the juvenile's home and
observe the firearm there, such an explanation did not require the detective's
testimony that someone had alleged that the juvenile possessed a firearm, nor
that the juvenile's mother had "directed" police to "[the
juvenile's] bedroom," in which the firearm subsequently was found.  See Rosario, 430 Mass. at 509-510.  It would have sufficed to explain that he was
present at the juvenile's home to execute a search warrant and searched the home
consistent with the warrant.
      We do not agree, however, that the
improper admission of this hearsay prejudiced the juvenile in the circumstances
of this case.  With respect to the
detective's testimony repeating an allegation from an unnamed person that the
juvenile possessed a firearm, any prejudice from that statement was obviated
once the mother testified based on her own personal knowledge that she had
contacted the police because she was concerned about the juvenile's possession
of a firearm.  The substance of the
out-of-court allegation was therefore "independently before the
jury."  Sullivan, 478 Mass. at
377.  Similarly, the detective's
testimony to the effect that the mother had directed police to the juvenile's
room "likely had only a slight effect on the jury," if any.  Grier, 490 Mass. at 478.  The mother herself testified that the firearm
was "always in the room," and police found the firearm under a pillow
on which the juvenile was resting his head. 
Thus, while improper, admission of this hearsay embedded in the
detective's testimony does not amount to prejudicial error here.
      c. 
Sentencing.  The juvenile also
challenges his sentence on a number of grounds. 
"Our review is limited to whether the juvenile's sentence was
unconstitutional or otherwise unlawful, and such questions of law are subject
to de novo review."  Commonwealth v.
Yasir Y., 494 Mass. 432, 437 (2024).  We
discern no basis for disturbing the sentence.
      First, the juvenile requests a remand to
the Juvenile Court for resentencing on the ground that the judge failed to make
written findings as required by G. L. c. 119, § 58
(§ 58).  Section 58 provides
that a judge may sentence a juvenile adjudicated on a youthful offender
indictment to "a sentence provided by law," but requires that the
judge "shall make a written finding, stating . . . reasons
therefor, that the present and long-term public safety would be best protected
by" such a sentence.  While we agree
with the juvenile that the judge erred in failing to issue written findings,
that error did not prejudice the juvenile because the judge gave a detailed
explanation of the reasons for the juvenile's sentence on the record at his
sentencing.  We therefore decline to
remand the case for resentencing on this basis. 
Cf. Fay v. Commonwealth, 379 Mass. 498, 504-505 (1980) (due process
satisfied by extensive oral findings).[7]
      Second, the juvenile argues that
§ 58's requirement that a judge consider whether an adult sentence for a
youthful offender would "best protect[]" the "present and
long-term public safety" is unconstitutionally vague.  "A law is void for vagueness if persons
of common intelligence must necessarily guess at its meaning and differ as to
its application . . . or if it subjects people to an unascertainable
standard."  Commonwealth v. Cassidy,
479 Mass. 527, 538, cert. denied, 586 U.S. 876 (2018), quoting Chief of Police
of Worcester v. Holden, 470 Mass. 845, 854 (2015).  "[V]agueness challenges to statutes
which do not involve First Amendment freedoms must be examined in the light of
the facts of the case at hand." 
Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 522 (1986),
quoting United States v. Powell, 423 U.S. 87, 92 (1975).  And, "even when the outer boundaries of
a law are imprecise, such imprecision does not permit a facial attack on the
entire law by one whose conduct falls squarely within the hard core of the
[law's] proscriptions, particularly if greater specificity in the law is
impractical" (quotations and citation omitted).  Commonwealth v. Orlando, 371 Mass. 732, 734
(1977).
      We long have recognized that, while
G. L. c. 119, § 53, requires that juveniles before the Juvenile
Court must "as far as practicable . . . be treated, not as
criminals, but as children in need of aid, encouragement and guidance,"
§ 58 reflects "the Legislature's obvious intent to increase the
penalties for children who offend firearms laws," Commonwealth v. Connor
C., 432 Mass. 635, 645 (2000).  The
Legislature has determined that "terms of incarceration, sometimes
lengthy, be served in State prisons by some children found to imperil the
public safety."  Id. at 642.  And § 58 mandates that, at the required
hearing "to determine the sentence by which the present and long-term
public safety would be best protected," a judge "shall consider"
a list of factors, including, among others, "the nature, circumstances and
seriousness of the offense"; "the youthful offender's court and
delinquency records"; "the success or lack of success of any past
treatment or delinquency dispositions regarding the youthful offender";
"and the likelihood of avoiding future criminal conduct."  G. L. c. 119, § 58, fourth
par.
      Here, in light of the judge's findings at
the juvenile's sentencing, we need not explore any imprecision in the "outer
boundaries" of the standard under § 58, see Orlando, 371 Mass. at
734, because the judge's findings place the juvenile's sentence well within the
bounds of the statute's terms requiring the judge to consider whether an adult
sentence would best protect present and long-term public safety.  The judge found that the juvenile, by then
age nineteen, had been committed to DYS custody on nine prior occasions.  The judge reviewed twenty-seven incident
reports involving the juvenile, including at least three instances of violence
against other DYS residents and at least three instances of escape from DYS
custody.  On the basis of the juvenile's
record, the judge found that the juvenile had "failed to comply with any
service that has been provided to him," and that he was "not
appropriate for a subsequent recommitment to [DYS]."  In these circumstances, we conclude that the
juvenile's vagueness challenge fails, because he falls squarely within the
category of offenders for whom a judge may conclude that an adult sentence
would "best protect[]" the "present and long-term public
safety," G. L. c. 119, § 58, fourth par.  See Orlando, supra.
      Third, and finally, the juvenile argues
that his sentence was unconstitutionally cruel and unusual.  "To reach the level of cruel and
unusual, the punishment must be so disproportionate to the crime that it
'shocks the conscience and offends fundamental notions of human
dignity.'"  Commonwealth v. Sharma,
488 Mass. 85, 89 (2021), quoting Commonwealth v. LaPlante, 482 Mass. 399, 403
(2019).  "Because the Legislature
has broad discretion in prescribing penalties for criminal offenses, the
[juvenile] has the burden of proving disproportionality."  Sharma, supra, citing Cepulonis v.
Commonwealth, 384 Mass. 495, 497 (1981). 
To decide whether the juvenile has met this burden, this court has
adopted a "tripartite analysis" comprising "(1) an inquiry into
the nature of the offense and the offender in light of the degree of harm to
society, (2) a comparison between the sentence imposed here and punishments
prescribed for the commission of more serious crimes in the Commonwealth, and
(3) a comparison of the challenged penalty with the penalties prescribed for
the same offense in other jurisdictions" (quotations and citations
omitted).  Sharma, supra.  For juveniles, "this analysis is
'supplemented with the greater weight given to a juvenile defendant's
age.'"  Id., quoting Commonwealth v.
Perez, 477 Mass. 677, 684 (2017).
      The juvenile attempts to carry his burden
of proving disproportionality mainly by emphasizing the length of his sentence
compared to the sentences of others for the same offense in Massachusetts.  He observes that his sentence of from four to
eight years approaches the ten-year maximum sentence under G. L.
c. 269, § 10 (m); that his sentence exceeded the upper range of two
to three years under the adult Advisory Sentencing Guidelines updated in 2019
by the Massachusetts Sentencing Commission; and that it exceeded by a similar
amount the median lower and upper range sentences imposed on adults convicted
under the statute in the Superior Court in 2018 according to data compiled by
the Massachusetts Sentencing Commission. 
Citing Commonwealth v. Mattis, 493 Mass. 216, 237 (2024), he compares
the upper end of his sentence with the fifteen years a twenty year old
convicted of murder prior to August 2, 2012, must serve before parole
eligibility and notes that State prison sentences of any length are relatively
rare for juveniles adjudicated as youthful offenders.  Finally, he asserts in a single sentence that
his sentence also was disproportionate because of his age and record as well as
the nature of the offense, nonviolent gun possession at his home.
      The juvenile has not carried his burden of
showing that his sentence of from four to eight years, with credit for 590 days
spent in DYS custody, is constitutionally disproportionate.  Possession of a large capacity feeding device
is a serious offense for which the Legislature has prescribed mandatory minimum
sentences, G. L. c. 269, § 10 (m), and here police found
the extended magazine loaded with thirty rounds of ammunition and attached to a
firearm with a chambered round.  The
juvenile does not identify any error in the judge's statement of reasons
detailing the juvenile's lengthy prior record, discussed supra.  The juvenile's comparisons to the Advisory
Sentencing Guidelines and average sentences imposed do not account for his
particular characteristics; his sentence permits the possibility of parole far
sooner than any juvenile's sentence for murder in the first degree, the only
other offense he identifies by way of comparison; and he has not directed this
court to any basis for concluding that his sentence diverges from sentences for
analogous offenses in other jurisdictions.  Even considering the juvenile's age at the
time of the offense, we conclude that the sentence is not "so
disproportionate to the crime that it shocks the conscience and offends
fundamental notions of human dignity" in violation of the Eighth Amendment
to the United States Constitution or art. 26 of the Massachusetts Declaration
of Rights.  Commonwealth v. Concepcion,
487 Mass. 77, 86, cert. denied, 142 S. Ct. 408 (2021), quoting Commonwealth v.
LaPlante, 482 Mass. at 403.
      3. 
Conclusion.  We hold that the
parent-child witness disqualification applicable in proceedings "in which
the victim . . . is not a family member and does not reside in the
family household" under G. L. c. 233, § 20, Fourth, does
not disqualify a parent from testifying against a child when that child is not
a minor at the time of the testimony. 
The judge therefore did not err in admitting the testimony of the
juvenile's mother.  Although the judge
did err in admitting a detective's lay opinion that images of a firearm were
"identical" to the firearm admitted in evidence and hearsay that was
not required to establish the state of the officer's knowledge during the
search that yielded the firearm, these errors did not prejudice the
juvenile.  And although the judge erred
by failing to issue written findings pursuant to G. L. c. 119,
§ 58, that error also did not prejudice the juvenile.  We otherwise discern no error.  Accordingly, we affirm the juvenile's
delinquency and youthful offender adjudications and decline to vacate his
sentence.
So ordered.
      KAFKER, J. (dissenting, with whom Budd,
C.J., and Wendlandt, J., join).  I
respectfully dissent.  The Legislature
created the parent-child disqualification to protect the familial bond when
minor children are accused of criminal activity.  The Legislature concluded that such children
need guidance and assistance from their parents and recognized that the
parent-child bond is under particular stress when a child finds himself in
criminal trouble.  The Legislature thus
enacted G. L. c. 233, § 20, Fourth (§ 20, Fourth),
prohibiting parents from testifying against their children.
      The difficult question presented in this
case is whether, after a child turns eighteen, a parent may be required to
testify against her child -- at great cost to the parent-child bond --
concerning conduct and conversations that occurred when the child was still a
minor.  Although the charged criminal
activity in such cases takes place before the child turns eighteen, and the
resulting parental assistance and guidance at issue is provided before the
child turns eighteen, and is thus the very assistance and guidance the
Legislature intended to encourage and protect, the court nonetheless concludes
that such testimony may be required because the child has since turned eighteen
and is no longer a "minor child" at the time of the parent's
testimony.  The court so concludes
despite recognizing that the potential for such testimony will surely put heavy
pressure on the parent-child bond at the moment the child is most in need of
parental support and guidance.  I do not
believe that is what the Legislature intended in § 20, Fourth.
      "Our primary duty in interpreting a
statute is 'to effectuate the intent of the Legislature in enacting
it.'"  Matter of E.C., 479 Mass.
113, 118 (2018), quoting Sheehan v. Weaver, 467 Mass. 734, 737 (2014).  "To that end, we begin with the
statutory language. . . .  We
also consider the 'cause of [the statute's] enactment, the mischief or
imperfection to be remedied and the main object to be accomplished, to the end
that the purpose of its framers may be effectuated.'"  Wallace W. v. Commonwealth, 482 Mass 789, 793
(2019), quoting Adoption of Daisy, 460 Mass. 72, 76-77 (2011).  Indeed, "[i]t is a well-established
canon of statutory construction that a strictly literal reading of a statute
should not be adopted if the result will be to thwart or hamper the
accomplishment of the statute's obvious purpose, and if another construction
which would avoid this undesirable result is possible" (citation
omitted).  Reade v. Secretary of the
Commonwealth, 472 Mass. 573, 578 (2015), cert. denied, 578 U.S. 946
(2016).  When I consider the statutory
language, the cause of the enactment, the mischief to be remedied, and the main
object to be accomplished, I conclude that the disqualification does not vanish
the moment the child turns eighteen.
      The first clause of § 20, Fourth,
provides that "[a] parent shall not testify against the parent's minor
child . . . in a proceeding before an inquest, grand jury, trial of
an indictment or complaint or any other criminal, delinquency or youthful
offender proceeding in which the victim in the proceeding is not a family
member and does not reside in the family household."  G. L. c. 233, § 20,
Fourth.  So long as the child is a minor
at the time of the alleged criminal activity and at the time of the proceeding,
the statute is simple to apply:  the
parent "shall not testify against the parent's minor child."  If the child turns eighteen at some point
before or during the proceedings, however, the statute becomes markedly less
clear.[1]  Under the first clause, the
disqualification could be read to apply to any proceeding that occurs before
the child turns eighteen, but not to any proceeding that occurs after the child
turns eighteen, even within the same case. 
The court adopts this reading even though both the alleged criminal
conduct and any parental assistance and guidance provided in response, the
sanctity of which the Legislature sought to protect, take place when the child
is a minor before the child turns eighteen. 
That the disqualification would apply to earlier but not later
proceedings in the same case is irreconcilable with the Legislature's desire to
protect the parent-child relationship and to foster parental guidance and
advice, especially at a critical juncture of the minor child's life.  The disqualification would be dependent upon
court schedules, backlogs, other delays unrelated to the purpose of the privilege
itself, or appellate remands or reversals.[2]
      The problem with the court's
interpretation of the first clause of § 20, Fourth, becomes even more
pronounced when we consider it in light of the final clause of § 20,
Fourth, which provides that "in a case in which the victim is a family member
and resides in the family household, the parent shall not testify as to any
communication with the minor child that was for the purpose of seeking advice
regarding the child's legal rights." 
G. L. c. 233, § 20, Fourth.  Again, the question is raised:  If the conversation concerning the child's
legal rights took place when the child was under eighteen, but the child is now
over eighteen, does the disqualification apply? 
It depends on whether we determine the child's minority at the time of
the confidential conversation or at the time of the proceeding at which the
parent would testify about the conversation. 
If the disqualification does apply -- that is, if we consider only
whether the child was a minor at the time of the conversation at issue -- then
communications for the purpose of seeking legal advice may be protected after
the child turns eighteen under the final clause but not the first.  This is a peculiar result because the first
clause, which applies when the victim is not a family member, otherwise
provides much more expansive testimonial protection, not limited to
communications about legal rights, or indeed limited to communications at
all.  It is by no means apparent that the
Legislature intended to protect communications between a parent and a child for
the purpose of seeking legal advice when the victim is another family member
but not communications for the purpose of seeking legal advice when the victim
is not a family member.  The
communications took place in both contexts when the child was a minor.  The only difference is the age of the child
at the time of the testimony.  The
court's interpretation, however, seems to support this illogical result.
      The court, apparently recognizing the
difficulty of interpretation on this issue and the ambiguity of the language,
declines to resolve it.  Instead, it
states: 
"Nor does
the statute's final clause create an ambiguity. 
The Legislature chose not to extend the parent-child witness
disqualification to cases involving family household victims, evidently
concluding that doing so would too greatly 'diminish the evidence before the
court' in such cases.  [Three Juveniles
v. Commonwealth, 390 Mass. 357, 359 (1983), cert. denied sub nom. Keefe v.
Massachusetts, 465 U.S. 1068 (1984)]. 
Yet, consistent with this court's previous observation that compelling a
parent to testify over a child's objection may in certain circumstances 'raise
serious issues regarding the privilege against self-incrimination or the right
to counsel,' Matter of a Grand Jury Subpoena, [430 Mass. 590, 599 n.15 (2000)],
the Legislature did exclude, in family household victim cases, testimony 'as to
any communication with the minor child that was for the purpose of seeking
advice regarding the child's legal rights,' G. L. c. 233, § 20,
Fourth."
Ante at
   .
      The court's reasoning cannot withstand
scrutiny.  Even if we assume arguendo
that the Legislature was aware of and intended to address dicta from our
previous decisions, warning of potential constitutional issues that might arise
if a parent is forced to testify against a child about legal advice, it does
not follow that the Legislature would choose to address those potential
constitutional concerns only in the scenario where the victim is a household
member, leaving the statute exposed to possible constitutional challenge in the
case where the victim is not a household member and the then child is now an
adult.  The construction I propose avoids
this irrational result, concluding that communications between a parent and a
child for the purposes of seeking legal advice are protected when the victim is
not a family and household member as well as when the victim is a family and
household member, even when the then child is now an adult.
      Indeed, the interpretation I propose
respects the over-all structure and purpose of § 20, Fourth, and avoids
the problems created by the court's reading. 
To summarize, it is apparent from the structure of § 20, Fourth,
that the Legislature posited two types of disqualification when it comes to
parents testifying against their child. 
The first applies to the situation where the victim is not a family
member, and the second applies where the victim is a family member.  It is significant, in this regard, that in
the latter situation, where the parent may be torn between supporting a child
who committed a crime and a child who is a victim, and the testimony regarding
what occurred between family members may be critical to the prosecution's case,
the disqualification is limited to a parent's testimony regarding
communications concerning the child's legal rights.  This encourages a child to seek advice from a
parent and for the parent to provide guidance on this narrow but important
topic by protecting that communication regardless as to whether the parent's
testimony is sought after the child is no longer a minor.  At the same time, the Legislature determined
not to protect any other interactions between the parent and the child,
presumably because where the victim is herself a family member, the parent may
be differently positioned, may have provided support and guidance to the
victim, and may be a key witness to the events at issue.
      In the former scenario, where the victim
is not a family member, however, the parental bond is not subject to divided
loyalty, the parent's testimony is also less likely to be as critical to
proving the case against the child, and therefore the disqualification is not
so narrowly tailored; it covers all interactions between the child and the
parent, including communications regarding legal advice.  It is not at all apparent that the
Legislature intended that this more fulsome disqualification would vanish when
the child turns eighteen.
      Nonetheless, the court concludes that the
text of the first clause, construed narrowly, is "conclusively clear"
and bars all testimony against a parent's minor child only when that child is
still a minor at the time of testimony. 
Ante at    .  In my
view, for the reasons discussed above, the statutory text is far less clear
than the court contends when read as a whole. 
See Commonwealth v. Vigiani, 488 Mass. 34, 36, 40 (2021) ("When
construing a statute, [which in this case was the parental disqualification
provision,] we look first and foremost to the language of the statute as a
whole. . . .  Even clear
statutory language is not read in isolation" [quotation and citation
omitted]).  Given these ambiguities, I
turn to the legislative history for further assistance, particularly in
resolving the difficult question of what the Legislature intended to do about
testimony by parents regarding their interactions with their children while the
children were minors, but whose children have turned eighteen by the time of
the proceeding at issue.  See Makis M. v.
Commonwealth, 494 Mass. 23, 30 (2024) ("Where the meaning of statutory
language is ambiguous, we turn to the legislative history to determine the
Legislature's intent").  See also
Vigiani, supra at 41 (considering legislative history when interpreting
parental disqualification provision).
      Here, the intent of the Legislature is
quite informative.  The Legislature
specifically recognized that children who commit crimes need the assistance and
guidance of their parents and that the parent-child bond must be protected, particularly
under these difficult circumstances. 
Numerous statements by bill sponsors and legislative leaders emphasize
these twin aims in the consideration and passage of the parent-child
disqualification.  See DeCosta-Klipa,
Should Parents Be Forbidden from Testifying against Their Children?, Boston.com
(Apr. 24, 2018), https://www.boston.com/news/politics/2018/04/
24/should-parents-be-forbidden-from-testifying-against-their-children
[https://perma.cc/4HMT-2VTY] (Senator Cynthia Creem, long-time proponent of
disqualification and sponsor of this legislation, explained that if parent
could later testify against child in court, "a child isn't going to be
willing to confide in their parent"); Landry, Juvenile Justice Reform in
the Criminal Justice Package (June 14, 2018), https://
willbrownsberger.com/juvenile-justice-reform
(according to website of Senator Will Brownsberger, Senate's chief negotiator
on final criminal justice reform bill, provision was "designed to
encourage children to go to their parents when they find themselves in [legal]
trouble without fear that what they tell their parents will be used against
them" [emphasis added]); Miller, Mass. Legislature Reveals Final Criminal
Justice Package, Boston Globe, Mar. 23, 2018 (quoting House majority leader as
stating, in reference to amended § 20, Fourth, "You start pitting
family members against each other, no matter how dysfunctional the family, I
think you've ruined that family forever"); Miller, Bill Would Bar Parents'
Testimony Against Their Kids in Nearly All Cases, Boston Globe, Oct. 12, 2017
(statement by chair of Senate Committee on Ways and Means that "[i]f
parents can be compelled to testify against a child, this severely limits a
parent's ability to help their child" [emphasis added]).  See also Vigiani, 488 Mass. at 41 n.7
(relying on this same legislative history). 
Cf. Hearing before Joint Committee on the Judiciary (Sept. 16, 2015)
https://malegislature.gov/Events/Hearings/Detail/2232 (statement of Sen. Karen
Spilka) (regarding similar bill she proposed in 2015-2016 legislative
session: 
"Children . . . often and should rely on their
parents for guidance, help, and access to other resources and a parent's
ability to help can be significantly limited if the parents are forced to
testify regarding these conversations" [emphasis added]).[3]
      It is clear, then, that the Legislature
understood parents to be an indispensable source of support and trust for
children who find themselves in trouble, and that such support requires ongoing
protection in court.  Preserving the
parent-child bond in these circumstances is at the heart of the legislative
history.  See Vigiani, 488 Mass. at 41
n.7 ("Legislative history confirms that protecting the parent-child
relationship is the purpose the Legislature had in mind when it last amended
§ 20, Fourth, in 2018").  The
importance of that parent-child bond in these circumstances has also been
eloquently described by courts as follows: 

"It would be
difficult to think of a situation which more strikingly embodies the intimate
and confidential relationship which exists among family members than that in
which a troubled young person, perhaps beset with remorse and guilt, turns for
counsel and guidance to his mother and father. 
There is nothing more natural, more consistent with our concept of the
parental role, than that a child may rely on his parents for help and
advice.  Shall it be said to those
parents, 'Listen to your son at the risk of being compelled to testify about
his confidences?'"  (Citation omitted.)
People v.
Fitzgerald, 101 Misc. 2d 712, 715 (N.Y. County Ct. 1979), cited generally in
Matter of a Grand Jury Subpoena, 430 Mass. at 595 n.9.
      There is also nothing in the legislative
history suggesting that the Legislature concluded that, once the child turns
eighteen, such testimony is now permissible and appropriate.  The proceedings concern what the child did
while a minor, and the testimony draws on the guidance, assistance, and other
activity undertaken by the parent while the child was a minor -- matters of
central concern to the Legislature, as explained above.  The disqualification was also designed to
protect the parent-child bond, a bond the Legislature considered critical to
the child's care and rehabilitation.  See
Vigiani, 488 Mass. at 41.  "To read
this statute without such cause in mind would disregard the mischief or
imperfection to be remedied and the main object to be accomplished by the
statute, and would run afoul of the Legislature's intent" (quotation
omitted).  Commonwealth v. Perez Narvaez,
490 Mass. 807, 813-814 (2022).
      The alarming consequences of allowing such
testimony once the child turns eighteen are also on stark display in the case
at bar.  Worried about one of her sons,
the mother proactively called the police to alert them to the presence of a gun
in the family home.  She acted to protect
her child, whose conduct had become alarming; she tried to guide him, even
though it placed her son in legal jeopardy. 
When she was called to the stand at her son's trial, she answered some
initial questions about her children and admitted that she called the police on
the date in question, but refused to testify about her conversation with the
police.  In response, the judge held her in
contempt and announced he would "hold [her] day-to-day, and bring [her]
back every day until [she] compl[ied] with the Court's order."  As a result, the mother was held in contempt
and kept in jail overnight.[4]  She was
brought into court the next morning in handcuffs and only then agreed to testify,
at which point she identified her son in a still image from a music video
recording and in still images of a person holding a gun.[5]  When she was asked to identify the person in
the video recording, she said doing so was "a tough decision to make"
before ultimately identifying her son. 
After the mother left the witness stand, she was consoled while crying
by a family friend in the audience.  This
is precisely the kind of wrenching choice and awful stress on the family bond
that the testimonial disqualification was designed to avoid.  See Vigiani, 488 Mass. at 41 (discussing
legislative history).  See also
Fitzgerald, 101 Misc. 2d at 715 (discussing how requiring such testimony, and
holding parent in contempt if parent refuses, may "undermine public trust
in our system of justice" [citation omitted]).
      Requiring such testimony, and the severe
burden it places on the parent-child bond, also appears to undermine the
ultimate rehabilitative purpose of the juvenile justice system.  As we have repeatedly emphasized, "the
goal of the juvenile system of justice [is] 'to act in the best interests of
children by encouraging and helping them to become law-abiding and productive
members of society, and not to label and treat them as criminals.'"  Commonwealth v. Magnus M., 461 Mass. 459, 466
(2012), quoting Commonwealth v. Connor C., 432 Mass. 635, 646 (2000).  As explained above, the Legislature concluded
that children need to be able to seek and receive their parents' guidance and
support during troubled times, including discussing the details of their
misconduct.[6]  If testimony about such
interactions can be compelled in court, parents and children will be pitted
against each other, further fraying the family bonds necessary to assist
children in their rehabilitation.  Those
family bonds and children's need for rehabilitative support do not suddenly
terminate when the child turns eighteen. 
At that point, rehabilitation is often only just beginning.
      Basing the disqualification on the age of
the child at the time of the proceeding as opposed to the time of the criminal
activity also runs counter to the juvenile justice scheme more broadly, which
grants young people the rights of minors for conduct committed as a minor, even
if they have since turned eighteen.  See
G. L. c. 119, § 72 (a) ("[T]he juvenile court department
shall continue to have jurisdiction over children who attain their eighteenth
birthday pending final adjudication of their cases . . . or for any
other proceeding arising out of their cases. . . .  If a child commits an offense prior to his
eighteenth birthday, and is not apprehended until between such child's
eighteenth and nineteenth birthday, the court shall deal with such child in the
same manner as if he has not attained his eighteenth birthday, and all
provisions and rights applicable to a child under [eighteen] shall apply to
such child" [emphasis added]).[7]
      In sum, the purpose of the statute is to
protect the ability of parents to serve as a source of guidance and support for
their children at the moment their children find themselves in trouble with the
law and, in so doing, to preserve the parent-child bond, a bond that is
critical not only to the care of the child during these times but in the
child's ongoing rehabilitation as well. 
Protecting these conversations and interactions while the child is under
eighteen but then requiring parents to testify regarding such interactions and
any associated conduct after the child turns eighteen, thereby pitting the
parent against the child, would undermine the fundamental purposes of the
disqualification and the rehabilitative purposes of the juvenile justice
system.  I discern no such intention when
I consider the statutory language as a whole, the legislative history, the
mischief to be remedied, and the main objective of the legislation.
      For these reasons, I respectfully dissent.

footnotes

[1] We
acknowledge the amicus brief submitted by the youth advocacy division of the
Committee for Public Counsel Services, the Massachusetts Association of
Criminal Defense Lawyers, and Citizens for Juvenile Justice.

[2] The juvenile
also was charged with carrying a loaded firearm without a license, G. L.
c. 269, § 10 (n), and possession of a class D substance with intent
to distribute, G. L. c. 94C, § 32C (a).  These charges were dismissed prior to trial.

[3] The dissent
emphasizes that, under G. L. c. 119, § 72 (a), when a child
reaches his eighteenth birthday during Juvenile Court proceedings, "the
court shall deal with such child in the same manner as if he has not attained
his eighteenth birthday."  This
general provision, last amended in 2014, see St. 2014, c. 165, § 153,
does not supersede the more specific terms of § 20, Fourth, which, in
language first enacted in 2018, see St. 2018, c. 69, § 111, expressly
contemplates the disqualification's use in delinquency and youthful offender
proceedings but nevertheless limits the disqualification to testimony against a
"minor" child.  See
Commonwealth v. Irene, 462 Mass. 600, 610, cert. denied, 568 U.S. 968 (2012),
quoting Doe v. Attorney Gen. (No. 1), 425 Mass. 210, 215-216 (1997)
("Where two statutory provisions conflict, 'we have stated that the more
specific provision, particularly where it has been enacted subsequent to a more
general rule, applies over the general rule'").

[4] We need not
and do not express a view on the question whether this provision applicable in
cases involving a family household victim applies after a child reaches the age
of majority.  Nor need we consider the
admissibility in cases not involving a family household victim, where the child
is no longer a minor at the time of trial, of communications between a parent
and minor child for the purpose of seeking advice regarding the child's legal rights,
because no such communications are at issue here.

[5] See, e.g.,
Rostker v. Goldberg, 453 U.S. 57, 59-61 (1981) (registration for military
draft); Sharon v. Newton, 437 Mass. 99, 101 n.4 (2002) (ratification of
contracts made when minor); Hershkoff v. Board of Registrars of Voters of
Worcester, 366 Mass. 570, 575 (1974) (right to vote).

[6] Thus
discerning no prejudice from the admission of the disputed lay opinion
testimony regarding the firearm and still images, we need not reach the juvenile's
further argument that the judge should have conducted a voir dire examination
of the detective prior to admitting the testimony.

[7] For related
reasons, we reject the juvenile's argument that the judge abused his discretion
by declining to grant a continuance prior to sentencing.  In denying the continuance, the judge noted
that this case had been pending for two and one-half years, and that the
juvenile had had a sentencing hearing in this same case before the same judge
just two months prior; at the earlier sentencing hearing, the juvenile withdrew
a tendered plea because the judge, after making detailed oral findings, stated
that he would impose a sentence of from five to six years, with credit for 526
days served.  The juvenile contends that
a continuance of his sentencing following the jury's verdict was required
nonetheless so that he could gather updated DYS records to supplement the 2022
presentence investigation report and Statewide sentencing data.  Given the judge's statement of reasons and
the fact that the same judge had held a sentencing hearing in this same case
just two months prior, we discern no abuse of discretion in the denial of a
continuance.

footnotes for dissenting

[1] In the
instant case, the delinquency complaint issued in September of 2021, when the
juvenile was seventeen years of age, and the juvenile was adjudicated
delinquent in May of 2023.

[2] Time
standards dictate that cases should be disposed of within six months for those
ending in a bench trial (180 days), or eight months (240 days) for those ending
in a jury trial.  See Juvenile Court
Standing Order 2-18 (2018).  In fiscal
year 2024, 57.7 percent of disposed cases were disposed of within those time
periods.  See Executive Office of the
Trial Court, Case Flow Metrics Report: 
Fiscal Year 2024, at 7 (Oct. 2024). 
In fiscal year 2023, 57.2 percent were disposed of within those time
periods, and in fiscal year 2022, 57.4 percent. 
See Executive Office of the Trial Court, Case Flow Metrics Report:  Fiscal Year 2023, at 7 (Oct. 2023); Executive
Office of the Trial Court, Case Flow Metrics Report:  Fiscal Year 2022, at 6 (Oct. 2022).

[3] The court
focuses on the fraying of the parent-child bond at the moment of the parent's
testimony, which comes at great cost to the parent's relationship with the
child.  However, these statements from
legislators offer strong evidence that their concern was not just about
protecting the parent-child bond from the burden of testimony –- it was about
protecting the sanctity of that bond when the child is vulnerable and in
criminal trouble and seeks parental guidance, all of which occur when the child
is under eighteen.  As demonstrated by
the legislative history quoted above, the Legislature also specifically
recognized that assistance while the minor was in trouble would be negatively
affected by requiring later testimony about such assistance.

[4] The single
mother was thereby separated from her five children, notwithstanding arguments
by her counsel that she had no criminal record and presented no risk to public
safety.

[5] The mother
was shaken by the experience and asked the judge the next morning whether the
fact that she had been fingerprinted at the jail would have an impact on her
job-hunting prospects.

[6] The
Legislature has provided for parental involvement at every stage of the
juvenile justice process.  For example,
when children are summoned before the court, "a summons shall be issued to
at least one of its parents." 
G. L. c. 119, § 55. 
And children are not permitted to waive their rights without
participation of a parent or parental figure. 
See, e.g., G. L. c. 119, § 55A (waiver of jury trial
"shall not be received unless the child is represented by counsel or has
filed, through his parent or guardian, a written waiver of counsel");
Matter of a Grand Jury Subpoena, 430 Mass. at 599 n.15, citing Commonwealth v.
A Juvenile, 389 Mass. 128, 134–135 (1983) ("juvenile entitled to
'meaningful consultation' with interested adult before waiver of rights is
effective").  The statutory scheme
governing juvenile proceedings thereby recognizes that children need to consult
with parents and parental figures to navigate the justice system –- indeed, the
statutory scheme insists upon it.  See
Farber, Do You Swear to Tell the Truth, the Whole Truth, and Nothing but the
Truth against Your Child?, 43 Loy. L.A. L. Rev. 551, 569 (Winter 2010)
("Parents are the conduits through which professionals will be retained to
assist their child.  Accurate and truthful
information from the child better equips the parents to seek the appropriate
services. . . .  In
conferring with professionals such as lawyers, doctors, and therapists,
children are not particularly good self-reporters -- they tend to omit details
and their descriptions lack detail [particularly legally relevant
information]").

[7] If a minor
child commits an offense but is not apprehended until he is nineteen years old
or above, the Juvenile Court has jurisdiction to hold a "transfer
hearing," in which "a Juvenile Court judge . . .
determine[s] whether probable cause exist[s] and, if so, whether the public
interest would be served best by prosecuting the individual as an adult in the
District Court, or by discharging the individual."  Ulla U. v. Commonwealth, 485 Mass. 219, 220
(2020), citing G. L. c. 119, § 72A; Commonwealth v. Mogelinski,
473 Mass. 164, 172 (2015); Commonwealth v. Mogelinski, 466 Mass. 627, 646 &
n.11 (2013).